United States Court of Appeals,

Eleventh Circuit.

No. 94-4748.

UNITED STATES of America, Plaintiff-Appellee,

v.

Nelson LOGAL, Aarid Dahod, a.k.a. Aarid Mansur Dahodwala, John
Kuczek, Defendants-Appellants.

March 6, 1997.

Appeal from the United States District Court for the Southern
District of Florida. (No. 93-6014 CR-SM), Stanley Marcus, Jr.,
District Judge.

Before HATCHETT, Chief Judge, DUBINA, Circuit Judge, and COHILL[*],
Senior District Judge.

DUBINA, Circuit Judge:

## I. Statement of the Case

1. *Factual History.*

In 1981, Howard F. Sahlen, Jr. ("Sahlen") founded a private
investigation and security firm called Sahlen & Associates, Inc.
("SAI"). Sahlen was chairman and chief executive officer of the
company through April of 1989. In 1984, SAI became a publicly
traded company with its headquarters in Atlanta, Georgia.[1]

As a publicly traded corporation, SAI was required to file a
registration statement with the Securities and Exchange Commission
("SEC") detailing certain information for use by potential
investors. In addition, SAI was required to file quarterly and

---

[*]Honorable Maurice B. Cohill, Jr., Senior U.S. District
Judge for the Western District of Pennsylvania, sitting by
designation.

[1]The headquarters were later relocated to Deerfield Beach,
Florida.

annual reports containing financial information about the corporation's worth and profit levels. Financial statements included in SEC filings must be audited, and between 1985 and 1989 SAI's annual reports were audited by the accounting firm of Peat Marwick or its predecessor, Main Hurdman.

Between 1983 and 1989, SAI's operation grew from one office with 10 to 15 employees to about 100 offices with approximately 12,000 employees, and the company reported a tremendous increase in revenues. Unfortunately, SAI achieved this growth by making public stock offerings and obtaining bank loans through the use of false financial documents. SAI employees and others—including Sahlen, Nelson Logal ("Logal"), Aarif Dahod ("Dahod"), and John Kuczek ("Kuczek")—used various means to misrepresent SAI's financial condition, including check kiting, falsifying revenue figures in financial statements, and creating false documents to support the inflated revenue figures. Sahlen, Logal, Dahod, and Kuczek also devised and implemented various schemes to conceal the fact that they had inflated and fabricated SAI's revenue figures.

One of Sahlen's schemes to inflate revenue figures involved the generation of false invoices and investigative files for clients who were closely associated with Sahlen. SAI listed these accounts, which were never paid, under the heading of "special accounts." P.J. Management—whose president, Logal, was a childhood friend of Sahlen—enjoyed one of these "special accounts" with SAI. Kuczek & Associates, an insurance brokerage company owned by Kuczek, also had a "special account" during the 1987 fiscal year. Dahod was actively involved in the generation of false

investigative files to authenticate the invoices, even going so far as to create a computer program to facilitate the generation of false documentation on a computer he called "Betsy."

In order to disguise the financial instability of SAI, Sahlen devised a check kiting scheme to give the illusion that SAI had the funds necessary to pay operating expenses. Logal, who was operating his own business in Ohio called N.H. Logal, assisted Sahlen in the check kiting scheme by helping to deposit checks with full knowledge that the checks were backed by insufficient funds. In another scheme to conceal SAI's true fiscal status, SAI reported non-existent revenue in a category called "work in progress."[2]

The reporting of false revenue escalated substantially with each quarterly report filed by SAI, ultimately growing to $7,124,073. The house of cards began to fall when auditors from Peat Marwick started expressing concern about the large amount of aging accounts receivable on SAI's books. Peat Marwick told Sahlen that unless SAI began showing significant collections activities, the accounts receivable figures would have to be discounted, which would result in the reporting of much smaller income and revenue figures. To cover up the false revenue reported as accounts receivable, the defendants created additional schemes.

By the end of 1988, the amount of false revenue had grown to millions of dollars, and most of the uncollected receivables were fictitious. In late March of 1989, Sahlen learned that the SEC was investigating SAI's methods of reporting revenue. Sahlen also

_____

[2]"Work in progress" is an accounting device used to report anticipated revenues from partially completed work.

learned that Peat Marwick auditors planned to visit SAI's Miami, Florida, and Newark, New Jersey, field offices to examine files. Upon completion of its investigation, the SEC sought federal indictments against Sahlen, Logal, Dahod, and Kuczek.

2. *Procedural History.*

A federal grand jury in the Southern District of Florida returned a 29-count superseding indictment charging Logal, Dahod, and Kuczek, as well as Sahlen, with various violations of federal law.[3] All four defendants were charged in count 1 with conspiring to defraud the SEC and to commit securities fraud, bank fraud, and mail fraud, in violation of 18 U.S.C. § 371, and in count 28 with filing a false registration statement with the SEC on or about March 14, 1989, in violation of 15 U.S.C. §§ 78m and 78ff(a) and 18 U.S.C. § 2. Logal, Dahod, and Sahlen were also charged with seven counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a), 17 C.F.R. § 240.10b-5 (Rule 10b-5), and 18 U.S.C. § 2 (counts 2-8); eight counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2 (counts 9-16); six counts of filing false reports and statements with the SEC, in violation of 15 U.S.C. §§ 78m and 78ff(a) and 18 U.S.C. § 2 (counts 22-27); and one count of bank fraud, in violation of 18 U.S.C. §§ 1344 and 2 (count 29). Logal was charged with one additional count of bank fraud (count 17), and Sahlen was charged with five additional counts of bank fraud (counts 17-21).

Sahlen pled guilty to all counts of the indictment, but Logal,

---

[3]Additional defendants Theodore Leinweber, Paula Firebaugh, and Tony Davis pled guilty before the return of the superseding indictment and testified for the government at trial.

Dahod, and Kuczek proceeded to trial. The district court granted a motion for judgment of acquittal as to Dahod and Logal on count 9. The jury found Logal guilty of counts 1-8, 10-16, 22-25, and 29, and not guilty of counts 17 and 26-28. The jury found Dahod guilty of counts 1-8, 10-16, and 24-29, and not guilty of counts 22 and 23. The jury found Kuczek guilty of count 1 and not guilty of count 28.

Logal was sentenced to 60 months imprisonment as to count 1 and to 27 months of imprisonment as to the remaining counts, with the 27-month sentence to run consecutively to the 60-month sentence, for a total of 87 months of imprisonment. The court also ordered Logal to pay restitution totaling $59,338,184. Dahod was sentenced to a total of 144 months imprisonment and ordered to pay restitution in the amount of $59,338,184. Kuczek was sentenced to 37 months imprisonment and a 3-year term of supervised release and ordered to pay a fine of $4,000 and restitution totaling $21,586,487. Logal and Dahod are currently incarcerated.

Kuczek is not incarcerated, however, because he committed suicide the day before he was to begin serving his term of imprisonment. Following Kuczek's suicide, his counsel filed a "suggestion of death" with this court and asked this court to dismiss Kuczek's appeal as moot, to vacate Kuczek's sentence and conviction *in toto,* and to remand the case to the district court with instructions to dismiss the indictment. This court ordered that Kuczek's motions be carried with the case and instructed Kuczek's counsel to address in his brief the effect of Kuczek's suicide on the restitution order imposed by the district court. In

response to a motion for clarification, we specified that only issues relating to the effect of Kuczek's death on the restitution order should be addressed in Kuczek's appellate brief. [4] In his brief, counsel for Kuczek requests that he be allowed to file a brief presenting further challenges to the restitution order if this court determines that it has jurisdiction to entertain the merits of the appeal.

## II. Issues Presented

1. Whether the district court abused its discretion by denying Logal's motions for severance from Kuczek.

2. Whether Dahod's allegations of prosecutorial misconduct warrant reversal of his and Logal's convictions.

3. Whether the district court abused its discretion by admitting challenged evidence.

4. Whether the district court abused its discretion by declining to give requested jury instructions.

5. Whether the district court abused its discretion in framing its response to a jury question.

6. Whether the district court properly sentenced Dahod and Logal.

7. Whether the restitution component of Kuczek's sentence survives his death.

8. Whether this court should dismiss Kuczek's appeal as moot, vacate his conviction and sentence, and remand this matter to the district court to dismiss the indictment.

## III. Standards of Review

Regarding all but the last three issues presented in this appeal, we conclude that the defendants' arguments are meritless. Accordingly, we affirm the defendants' convictions without further

---

[4]Counsel for Kuczek complied fully with this court's directives.

discussion.[5]  We also affirm without discussion all of the sentencing issues raised by Dahod and Logal, save for their contention that the district court, in imposing their sentences, violated the Ex Post Facto Clause of the Constitution by considering amendments to the United States Sentencing Guidelines ("U.S.S.G." or "guidelines") that went into effect after Dahod and Logal's crimes had been completed.  A defendant's claim that his or her sentence was imposed in violation of the Ex Post Facto Clause presents a question of law, and we review questions of law *de novo. See, e.g., United States v. Hooshmand,* 931 F.2d 725, 727 (11th Cir.1991).  The remaining issues—viz., whether the restitution component of Kuczek's sentence survives his death, and whether this court should dismiss the appeal as moot, vacate Kuczek's conviction and sentence, and remand to the district court for dismissal of the indictment—also present questions of law subject to *de novo* review. *See generally United States v. Asset,* 990 F.2d 208 (5th Cir.1993); *United States v. Dudley,* 739 F.2d 175 (4th Cir.1984);  *United States v. Schumann,* 861 F.2d 1234 (11th Cir.1988).

IV. Discussion

1. *Guidelines Issue.*

Although Dahod and Logal were sentenced in 1994, they were sentenced pursuant to the pre1989 guidelines, because their offenses had ended prior to the enactment of the 1989 amendments and because those amendments included increases in the offense levels for fraud cases.  *See Miller v. Florida,* 482 U.S. 423, 435-36, 107 S.Ct. 2446, 2454, 96 L.Ed.2d 351 (1987).  Both Dahod and

---

[5]*See* 11th Circuit Rule 36-1.

Logal acknowledge that the district court imposed sentence on them pursuant to the pre-1989 version of U.S.S.G. § 2F1.1. Nevertheless, they argue that the district court violated the Ex Post Facto Clause by looking to the 1989 amendment to § 2F1.1 for guidance in determining the degree of their upward sentencing departures. Because the court indisputably used the pre-1989 guidelines to sentence Dahod and Logal, we conclude that no Ex Post Facto Clause violation occurred. Moreover, we note that six of our sister circuits have already approved the practice of looking at guidelines amendments that post-date applicable guidelines for the purpose of determining the appropriate degrees of upward sentencing departures. *See United States v. Harotunian,* 920 F.2d 1040, 1046 (1st Cir.1990) (approving use of amended guideline to guide upward departure); *United States v. Rodriguez,* 968 F.2d 130, 140 (2d Cir.) (same), *cert. denied,* 506 U.S. 847, 113 S.Ct. 140, 121 L.Ed.2d 92 (1992); *United States v. Bachynsky,* 949 F.2d 722, 734-35 (5th Cir.1991) (approving district court's consideration of proposed amendments to § 2F1.1 in determining level of upward departure), *cert. denied,* 506 U.S. 850, 113 S.Ct. 150, 121 L.Ed.2d 101 (1992); *United States v. Boula,* 997 F.2d 263, 267 (7th Cir.1993) (approving district court's consideration of amended § 2F1.1 to fashion upward departure and rejecting argument that doing so constituted application of the amended guideline); *United States v. Saffeels,* 39 F.3d 833, 838 (8th Cir.1994) (holding that "subsequent guidelines can be a useful touchstone in making the determinations of reasonableness called for in upward departure cases"); *United States v. Tisdale,* 7 F.3d 957, 967-68 (10th

Cir.1993) (holding that use of amended guideline to guide upward departure is permissible so long as the district court understands that the amended guideline provision is not controlling), *cert. denied,* 510 U.S. 1169, 114 S.Ct. 1201, 127 L.Ed.2d 549 (1994). *But see United States v. Canon,* 66 F.3d 1073, 1080 (9th Cir.1995) (holding that district court erred in referring to amended guideline to determine reasonable amount of upward departure). We choose to adopt the majority view of our sister circuits. Accordingly, we affirm Dahod and Logal's sentences.

2. *Restitution.*

Counsel for Kuczek asserts that the restitution order entered by the district court cannot survive Kuczek's suicide. Kuczek was sentenced to serve a 37-month term of imprisonment and a 3-year term of supervised release. Additionally, Kuczek was ordered to pay a fine of $4,000 and restitution totaling $21,586,487, pursuant to the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663. Kuczek filed a notice of appeal, but the day before he was to begin serving his sentence of incarceration, he committed suicide. Kuczek's appellate attorney argues that his client's death rendered the entire conviction and sentence, including the restitution order, void *ab initio,* and that the restitution order is therefore without effect.

This circuit has adopted the general rule that the death of a defendant during the pendency of his direct appeal renders his conviction and sentence void *ab initio; i.e.,* it is as if the defendant had never been indicted and convicted. *See United States*

*v. Pauline,* 625 F.2d 684, 685 (5th Cir.1980)[6]; *United States v. Schumann,* 861 F.2d 1234, 1236 (11th Cir.1988). However, two of our sister circuits have recognized an exception to the general rule of abatement *ab initio* in cases in which a criminal sentence includes an order that the defendant pay restitution to the victims of his crimes. See *United States v. Dudley,* 739 F.2d 175, 177 (4th Cir.1984); *United States v. Asset,* 990 F.2d 208 (5th Cir.1993). In *Dudley,* the Fourth Circuit premised its holding on the assumption that a restitution order is compensatory in nature. That assumption is clearly at odds with our holding in *United States v. Johnson,* 983 F.2d 216, 220 (11th Cir.1993), that "though restitution resembles a judgment "for the benefit of' a victim, it is penal, rather than compensatory." Furthermore, any implication that restitution resembles a civil judgment is undermined in this court's opinion in *United States v. Satterfield,* 743 F.2d 827, 836 (11th Cir.1984), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985).

The Fifth Circuit's opinion in *United States v. Asset,* 990 F.2d 208 (5th Cir.1993), is also distinguishable. *Asset* held only that an abatement did not disturb a voluntary restitution payment made prior to the defendant's death. *Id.* at 214. This holding is in accordance with our decision in *Schumann* where we amended *Pauline* to hold that only fines not yet collected at the time of death are abated. *Schumann,* 861 F.2d at 1236.

---

[6]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

If we were to allow the restitution order to survive Kuczek, a statutory problem would also arise. Title 18 U.S.C. § 3663(a)(1) states that before the court can impose a restitution order, a defendant must first be convicted of a crime. Under the doctrine of abatement *ab initio,* however, the defendant "stands as if he never had never been indicted or convicted." *Schumann,* 861 F.2d at 1237. The absence of a conviction precludes imposition of the restitution order against Kuczek or his estate pursuant to § 3663.

Moreover, a fundamental principle of our jurisprudence from which the abatement principle is derived is that a criminal conviction is not final until resolution of the defendant's appeal as a matter of right. See *Griffin v. Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956). As the Seventh Circuit has stated, "when an appeal has been taken from a criminal conviction to the court of appeals and death has deprived the accused of his right to our decision, the interests of justice ordinarily require that he not stand convicted without resolution of the merits of his appeal...." *United States v. Moehlenkamp,* 557 F.2d 126, 128 (7th Cir.1977). In the present case, Kuczek appealed both the conviction and the restitution order with the expectation that his appeal would result in a reversal. To uphold the restitution order against Kuczek, who has been denied the opportunity to properly contest his conviction, violates the finality principle.

Concerning the argument that the heirs of Kuczek's estate may receive a windfall, nothing precludes the victims from bringing a separate civil action to prevent any improper benefit to Kuczek's estate. Accordingly, we grant Kuczek's motion requesting that we

vacate his conviction and sentence, remand the case to the district court, and instruct the district court to dismiss the indictment.

AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion.

COHILL, Senior District Judge, concurring in part and dissenting in part.

I respectfully dissent from that portion of the opinion in which a majority of the panel holds that Mr. Kuczek's death by suicide, before his appeal was decided, necessitates the abatement of the restitution order. While *United States v. Moehlenkamp,* 557 F.2d 126, 128 (7th Cir.1977), states that a conviction can not stand where "death has deprived the accused of his right to appeal our decision," in this case the accused deprived himself of that right by his own hand. This situation is more analogous to the scenario in which the appellant in a criminal case becomes a fugitive; in such a case, his appeal is lost. *Molinaro v. New Jersey,* 396 U.S. 365, 365-366, 90 S.Ct. 498, 498-499, 24 L.Ed.2d 586 (1970). I believe that a narrow exception should be carved out of the general abatement rule where an appellant takes his own life.

I join in the opinion in all other respects.