**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Manuel Antonio NORIEGA,**
**Defendant–Appellant.**

**Nos. 92–4687, 96–4471.**

United States Court of Appeals,
Eleventh Circuit.

July 7, 1997.

mi, FL, FOR Plaintiff–Appellee in No. 96–4471.

Michael O'Kane, Coral Gables, FL, for applicant Peter Eisner.

Before ANDERSON and EDMONDSON, Circuit Judges, and KRAVITCH, Senior Circuit Judge.

KRAVITCH, Senior Circuit Judge:

Manuel Antonio Noriega appeals: (1) his multiple convictions stemming from his involvement in cocaine trafficking;[1] and (2) the district court's denial of his motion for a new trial based on newly discovered evidence. In attacking his convictions, Noriega asserts that the district court should have dismissed the indictment against him due to his status as a head of state and the manner in which the United States brought him to justice. Noriega also contends that the district court committed two reversible evidentiary errors. Alternatively, he seeks a new trial based on his discovery of: (1) the government's suppression of its pact with a non-witness; and/or (2) certain allegations, lodged after his conviction, that a group associated with the undisclosed, cooperating non-witness bribed a prosecution witness. We affirm Noriega's convictions and the district court's order denying his new trial motion.

## I.

On February 4, 1988, a federal grand jury for the Southern District of Florida indicted Manuel Antonio Noriega on drug-related charges. At that time, Noriega served as commander of the Panamanian Defense Forces in the Republic of Panama. Shortly thereafter, Panama's president, Eric Arturo Delvalle, formally discharged Noriega from his military post, but Noriega refused to

Jon May, May & Cohen, P.A., Ft. Lauderdale, FL, Frank A. Rubino, Coconut Grove, FL, for Defendant–Appellant.

Roberto Martinez, U.S. Atty., Dawn Bowen, Linda Collins Hertz, Asst. Attys. Gen., Miami, FL, for Plaintiff–Appellee in No. 92–4687.

Kendall Coffey, U.S. Atty., Linda Collins Hertz, Dawn Bowen, Asst. U.S. Attys., Mia-

---

1. Pursuant to the jury's verdicts, the district court entered convictions against Noriega for: conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d); racketeering in violation of 18 U.S.C. §§ 2, 1962(c); conspiracy to import and to distribute cocaine in violation of 21 U.S.C. § 963; two counts of distribution of cocaine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 959; manufacture of cocaine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 959; conspiracy to manufacture, to distribute and to import cocaine in violation of 21 U.S.C. § 963; and traveling in interstate or foreign commerce to promote an unlawful enterprise in violation of 18 U.S.C. §§ 2, 1952(a)(3).

accept the dismissal. Panama's legislature then ousted Delvalle from power. The United States, however, continued to acknowledge Delvalle as the constitutional leader of Panama. Later, after a disputed presidential election in Panama, the United States recognized Guillermo Endara as Panama's legitimate head of state.

On December 15, 1989, Noriega publicly declared that a state of war existed between Panama and the United States. Within days of this announcement by Noriega, President George Bush directed United States armed forces into combat in Panama for the stated purposes of "safeguard[ing] American lives, restor[ing] democracy, preserv[ing] the Panama Canal treaties, and seiz[ing] Noriega to face federal drug charges in the United States." *United States v. Noriega,* 746 F.Supp. 1506, 1511 (S.D.Fla.1990). The ensuing military conflagration resulted in significant casualties and property loss among Panamanian civilians.[2] Noriega lost his effective control over Panama during this armed conflict, and he surrendered to United States military officials on January 3, 1990. Noriega then was brought to Miami to face the pending federal charges.

Following extensive pre-trial proceedings and a lengthy trial, a jury found Noriega guilty of eight counts in the indictment and not guilty of the remaining two counts. The district court entered judgments of conviction against Noriega upon the jury's verdict and sentenced him to consecutive imprisonment terms of 20, 15 and five years, respectively. Noriega timely appealed his convictions. During the pendency of that appeal, Noriega filed in district court a motion for a new trial based on newly discovered evidence. This court deferred further consideration of Noriega's initial appeal while the district court heard Noriega's new trial motion. When the district court denied that motion, Noriega took a second, timely appeal. Both matters now are properly before this court.

## II.

At trial, the government presented the testimony of numerous witnesses *as well as* documentary evidence to prove Noriega's guilt. Noriega, through both cross-examination and defense witness testimony, fervently contested the veracity of the witnesses and the significance of the documents offered by the government. Under the defense theory of the case, Noriega's subordinates used his name in their drug-trafficking schemes, but Noriega had no personal connection to the alleged offenses. "The facts set out below are those which the jury might reasonably have found from the evidence properly admitted at trial." *United States v. Paradies,* 98 F.3d 1266, 1271 (11th Cir.1996).

From the early 1970s to 1989, Noriega secured progressively greater dominion over state military and civilian institutions in Panama, first as his nation's chief of military intelligence and later as commander of the Panamanian Defense Forces. In the early 1980s, Noriega's position of authority brought him into contact with a group of drug traffickers from the Medellin area of Colombia (the "Medellin Cartel"). Various Medellin Cartel operatives met with Noriega's associates and, later, with Noriega personally, regarding the Medellin Cartel's desire to ship cocaine through Panama to the United States. Eventually, Noriega and the Medellin Cartel reached the first of a series of illicit agreements. Thereafter, from 1982 through 1985, with Noriega's assistance, the Medellin Cartel transported significant quantities of cocaine through Panama to the United States. It also utilized its relationship with Noriega to move ether for cocaine processing and substantial cash proceeds from drug sales from the United States to or through Panama.

Noriega and his associates personally met with Medellin Cartel leaders in Colombia, Panama and Cuba regarding the transshipping arrangement, unofficial asylum for Medellin Cartel members fleeing prosecution and a botched plan to operate a cocaine processing laboratory in the Darien region of

---

**2.** The government stipulated to this fact before the district court in response to Noriega's motion to dismiss the indictment.

Panama. The Medellin Cartel directed large cash payments to Noriega in connection with its drug, ether and cash shipments through Panama. During this period, Noriega opened secret accounts in his name and the names of his family members with the Bank of Credit and Commerce International ("BCCI") in Panama. Noriega's associates made large, unexplained cash deposits into these accounts for him. In 1988, Noriega transferred approximately $20,000,000 of his amassed fortune to banks in Europe. The government ultimately located more than $23,000,000 of funds traceable to Noriega in financial institutions outside of Panama.

### III.

Noriega challenges his convictions on five distinct grounds: the first three relate to the district court's decision to exercise jurisdiction over this case and the final two concern evidentiary rulings by the district court. Noriega does not contend that the record contains insufficient evidence to support the jury's verdicts of guilt and the resultant judgments of conviction entered by the district court.

### A.

█ Noriega raised two of his three quasi-jurisdictional appellate claims via a pre-trial motion to dismiss the indictment which the district court denied. Generally, "when a district court denies a motion to dismiss [an] indictment, this court only reviews the denial for abuse of discretion." *United States v. Thompson*, 25 F.3d 1558, 1562 (11th Cir.1994). To the extent Noriega's assignments of error on these matters implicate the district court's resolution of questions of law, however, our review is *de novo*. *See generally United States v. Logal*, 106 F.3d 1547, 1550 (11th Cir.1997).

### 1.

█ Noriega first argues that the district court should have dismissed the indictment against him based on head-of-state immunity. He insists that he was entitled to such immunity because he served as the *de facto*, if not the *de jure*, leader of Panama. The district

court rejected Noriega's head-of-state immunity claim because the United States government never recognized Noriega as Panama's legitimate, constitutional ruler.

The Supreme Court long ago held that "[t]he jurisdiction of courts is a branch of that which is possessed by the nation as an independent sovereign power. The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself." *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812). The Court, however, ruled that nations, including the United States, had agreed implicitly to accept certain limitations on their individual territorial jurisdiction based on the "common interest impelling [sovereign nations] to mutual intercourse, and an interchange of good offices with each other...." *Id.* at 137. Chief among the exceptions to jurisdiction was "the exemption of the *person of the sovereign* from arrest or detention within a foreign territory." *Id.* (emphasis added).

The principles of international comity outlined by the Court in *The Schooner Exchange* led to the development of a general doctrine of foreign sovereign immunity which courts applied most often to protect foreign nations in their corporate form from civil process in the United States. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). To enforce this foreign sovereign immunity, nations concerned about their exposure to judicial proceedings in the United States:

follow[ed] the accepted course of procedure [and] by appropriate representations, sought recognition by the State Department of [their] claim of immunity, and asked that the [State] Department advise the Attorney General of the claim of immunity and that the Attorney General instruct the United States Attorney for the [relevant district] to file in the district court the appropriate suggestion of immunity....

*Ex Parte Republic of Peru*, 318 U.S. 578, 581, 63 S.Ct. 793, 795, 87 L.Ed. 1014 (1943) (citations omitted). As this doctrine emerged, the "Court consistently [ ] deferred

to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden B.V.*, 461 U.S. at 486, 103 S.Ct. at 1967.

In 1976, Congress passed the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611. The FSIA "contains a comprehensive set of legal standards governing claims of immunity in every *civil action* against a *foreign state or its political subdivisions, agencies, or instrumentalities.*" *Verlinden B.V.*, 461 U.S. at 488, 103 S.Ct. at 1967 (emphasis added). It codified the State Department's general criteria for making suggestions of immunity, and transferred the responsibility for case-by-case application of these principles from the Executive Branch to the Judicial Branch. *See id.* Because the FSIA addresses neither head-of-state immunity, nor foreign sovereign immunity in the criminal context, head-of-state immunity could attach in cases, such as this one, only pursuant to the principles and procedures outlined in *The Schooner Exchange* and its progeny. As a result, this court must look to the Executive Branch for direction on the propriety of Noriega's immunity claim. *See Kadic v. Karadzic*, 70 F.3d 232, 248 (2d Cir.1995) (questioning viability of head-of-state immunity doctrine in light of FSIA, but noting that, even if still operative, doctrine was inapplicable because Executive Branch had not recognized defendant as head of state).

Generally, the Executive Branch's position on head-of-state immunity falls into one of three categories: the Executive Branch (1) explicitly suggests immunity; (2) expressly declines to suggest immunity; or (3) offers no guidance. Some courts have held that absent a formal suggestion of immunity, a putative head of state should receive no immunity. *See, e.g., In re Doe*, 860 F.2d 40, 45 (2d Cir.1988). In the analogous pre-FSIA, foreign sovereign immunity context, the former Fifth Circuit accepted a slightly broader judicial role. It ruled that, where the Executive Branch either *expressly* grants or denies

a request to suggest immunity, courts must follow that direction, but that courts should make an independent determination regarding immunity when the Executive Branch neglects to convey clearly its position on a particular immunity request. *See Spacil v. Crowe*, 489 F.2d 614, 618–19 (5th Cir.1974) (granting petition for writ of mandamus directing district court to follow government's suggestion of immunity in civil case).[3]

Noriega's immunity claim fails under either the *Doe* or the *Spacil* standard. The Executive Branch has not merely refrained from taking a position on this matter; to the contrary, by pursuing Noriega's capture and this prosecution, the Executive Branch has manifested its clear sentiment that Noriega should be denied head-of-state immunity. Noriega has cited no authority that would empower a court to grant head-of-state immunity under these circumstances. Moreover, given that the record indicates that Noriega never served as the constitutional leader of Panama, that Panama has not sought immunity for Noriega and that the charged acts relate to Noriega's private pursuit of personal enrichment, Noriega likely would not prevail even if this court had to make an independent determination regarding the propriety of immunity in this case. *See generally In re Doe*, 860 F.2d at 45 (noting that "there is respectable authority for denying head-of-state immunity to a former head-of-state for private or criminal acts" and finding that immunity claim was waived by the government of the foreign defendant). Accordingly, we find no error by the district court on this point.

### 2.

■■■ Noriega next contends his conviction should be reversed because he alleges he was brought to the United States in violation of the Treaty Providing for the Extradition of Criminals, May 25, 1904, United States of America–Republic of Panama, 34 Stat. 2851 ("U.S.-Panama Extradition Treaty"). The Supreme Court's decision in *United States v. Alvarez–Machain*, 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992), forecloses this

---

3. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as

binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

argument.[4] In *Alvarez–Machain*, the Court considered the issue of "whether a criminal defendant, abducted to the United States from a nation with which it has an extradition treaty, thereby acquires a defense to the jurisdiction of this country's courts." *Id.* at 657. In answer, the Court stated: "We hold that he does not, and that he may be tried in federal district court for violations of the criminal law of the United States." *Id.*

In reaching this decision, the Court considered whether the treaty at issue *expressly* barred abductions. It determined that the treaty's provision that " '[n]either Contracting Party shall be bound to deliver up its own nationals . . .' [fails] to specify the only way in which one country may gain custody of a national of the other country for purposes of prosecution." *Id.* at 663–64, 112 S.Ct. at 2193–94 (quoting Extradition Treaty, May 4, 1978, United States of America–United Mexican States, 31 U.S.T. 5059 ("U.S.-Mexico Extradition Treaty")). The Court also rejected the argument that, by entering into an extradition treaty with Mexico, the United States *impliedly* agreed to seek custody of persons in Mexico only via extradition. *Id.* at 668–69, 112 S.Ct. at 2195–96 ("[T]o infer from this Treaty and its terms that it prohibits all means of gaining the presence of an individual outside of its terms goes beyond established precedent and practice.").

The article of the U.S.-Panama Extradition Treaty upon which Noriega relies for his extradition treaty claim contains almost the same language as the provision of the U.S.-Mexico Extradition Treaty at issue in *Alvarez–Machain*. *See* U.S.-Panama Extradition Treaty, art. 5 ("Neither of the contracting parties shall be bound to deliver up its own citizen or subject . . ."). Noriega contends that *Alvarez–Machain* is distinguishable despite the near identity of the relevant clauses because, at the time the United States entered into the U.S.-Panama Extradition Treaty, it knew or should have known that Panama's constitution prohibited the extradition of its nationals. This bald assertion, even if accepted, does not save Noriega's claim. A clause in Panama's constitution regarding the extradition of Panamanians, at most, informs the United States of the hurdles it will face when pursuing such extraditions in Panama; such a provision says nothing about the treaty signatories' rights to opt for self-help (i.e., abduction) over legal process (i.e., extradition).

■ Under *Alvarez–Machain*, to prevail on an extradition treaty claim, a defendant must demonstrate, by reference to the express language of a treaty and/or the established practice thereunder, that the United States affirmatively agreed not to seize foreign nationals from the territory of its treaty partner. Noriega has not carried this burden, and therefore, his claim fails.

3.

■ In his pre-trial motion, Noriega also sought the dismissal of the indictment

---

4. Noriega did not articulate this precise contention in district court, but instead only cited the U.S.-Panama Extradition Treaty as part of a broader Geneva Convention claim which he now has abandoned. When a criminal defendant fails to preserve properly a legal challenge, this court need only conduct a plain error review of that issue on appeal. *See United States v. Walker*, 59 F.3d 1196, 1198 (11th Cir.), *cert. denied*, ─── U.S. ───, 116 S.Ct. 547, 133 L.Ed.2d 450 (1995). Noriega insists that this court should excuse any waiver of his extradition treaty claim because at the time he presented his dismissal motion, Eleventh Circuit caselaw prohibited individuals from bringing claims under treaties. During the period preceding Noriega's indictment, this court had issued some decisions that cast doubt upon the right of an individual to raise treaty-based claims. *See, e.g., United States v. Rosenthal*, 793 F.2d 1214, 1232 (11th Cir.1986) ("Nor do we find merit in [the] argument that the actions of

the United States violate this country's extradition treaty with Colombia. Under international law it is the contracting foreign government that has the right to complain about a violation."), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). In other cases decided before Noriega filed his motion to dismiss, however, this court assumed that individuals had standing to enforce treaty provisions. *See, e.g., United States v. Herbage*, 850 F.2d 1463, 1466 (11th Cir.1988), *cert. denied*, 489 U.S. 1027, 109 S.Ct. 1158, 103 L.Ed.2d 217 (1989). We question whether Noriega failed to litigate this extradition treaty claim in district court due to the apparent, then-existing conflict in this circuit's authority regarding treaty enforcement, particularly given that Noriega chose to assert his Geneva Convention claim despite any uncertainty. Because, however, we find no error, plain or otherwise, we need not determine definitively the level of scrutiny applicable to this claim.

against him on the ground that the manner in which he was brought before the district court (i.e., through a military invasion) was so unconscionable as to constitute a violation of substantive due process. Noriega also argued that to the extent the government's actions did not shock the judicial conscience sufficiently to trigger due process sanctions, the district court should exercise its supervisory power to decline jurisdiction. The district court rejected Noriega's due process argument, and it declared Noriega's alternative supervisory power rationale non-justiciable. On appeal, Noriega offers no substantive argument regarding the due process prong of this claim, but rather discusses only his alternative supervisory power theory.[5] Because, however, the due process and supervisory power issues are intertwined, we discuss them both.

Noriega's due process claim "falls squarely within the [Supreme Court's] *Ker–Frisbie* doctrine, which holds that a defendant cannot defeat personal jurisdiction by asserting the illegality of the procurement of his presence." *United States v. Darby,* 744 F.2d 1508, 1530 (11th Cir.1984) (denying due process challenge based on government's extraterritorial seizure of defendant), *cert. denied sub nom., Yamanis v. United States,* 471 U.S. 1100, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985). *See Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952) ("This Court has never departed from the rule announced in *Ker v. Illinois,* 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421 (1886), that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'"). Noriega has not alleged that the government mistreated him personally, and thus, he cannot come within the purview of the caveat to *Ker–Frisbie* recognized by the Second Circuit in *United States v. Toscanino,* 500 F.2d 267 (2d Cir. 1974), were this court inclined to adopt such an exception. *See Darby,* 744 F.2d at 1531

(questioning viability of *Toscanino* exception and refusing to apply it absent allegations that *defendant* endured "cruel, inhuman and outrageous treatment"). Further, whatever harm Panamanian civilians suffered during the armed conflict that preceded Noriega's arrest cannot support a due process claim in this case. *See United States v. Payner,* 447 U.S. 727, 737 n. 9, 100 S.Ct. 2439, 2447, n. 9, 65 L.Ed.2d 468 (1980) (holding that even where government's conduct toward third parties "was so outrageous as to offend fundamental canons of decency and fairness, the fact remains that [t]he limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the *defendant* " (internal quotations omitted)).

■■■ Noriega's attempt to evade the implications of the *Ker–Frisbie* doctrine by appealing to the judiciary's supervisory power is equally unavailing. Although, "in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress," *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983), we are aware of no authority that would allow a court to exercise its supervisory power to dismiss an indictment based on harm done by the government to third parties. To the contrary, the Supreme Court has held that "[t]he supervisory power merely permits federal courts to supervise 'the administration of criminal justice' among the parties before the bar." *Payner,* 447 U.S. at 735 n. 7, 100 S.Ct. at 2446 n. 7 (quoting *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L.Ed. 819 (1943)) (rejecting defendant's claim that search of third party provided district court sufficient basis to exercise supervisory power to suppress seized evidence).

In *Payner,* the Court began by noting that an unlawful search of a third party would not

---

5. In his briefs, Noriega does invoke the substantive due process mantra, "shocking to the conscience," and, in the primary brief, he quotes dicta from an opinion in which the Supreme Court stated that a case could arise "in which the conduct of law enforcement agents is so outrageous that due process would absolutely bar the

government from invoking judicial processes to obtain a conviction. . . ." Appellant's Br. at 58 (quoting *United States v. Russell,* 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973)). Throughout his briefs, however, Noriega articulates only arguments related to the supervisory power issue.

warrant relief for the defendant under the Fourth Amendment; it then rejected the defendant's alternative supervisory power rationale on the grounds that "[t]he values assigned to the competing interests do not change because a court has elected to analyze the question under the supervisory power instead of the Fourth Amendment." *Id.* at 736, 100 S.Ct. at 2446. The Court explained that by exercising its supervisory power to suppress evidence based on governmental misconduct directed at persons other than the defendant when such action would not lie under the Fourth Amendment, the district court wrongly "substitut[ed][its] individual judgment for the controlling decisions of th[e] Court." *Id.* at 737, 100 S.Ct. at 2446. In a footnote, the Court then observed that "[t]he same difficulty attends [the defendant's] claim to the protections of the Due Process Clause of the Fifth Amendment." *Id.* at 737 n. 9, 100 S.Ct. at 2447 n. 9. A reasonable reading of *Payner* thus compels the conclusion that a court may not exercise its supervisory power to dismiss an indictment if the government treated third parties unconscionably, where, as here, such an approach would circumvent the Supreme Court's limiting construction of the Fifth Amendment.

Accordingly, the district court did not err when it declined to dismiss Noriega's indictment pursuant to either the Due Process Clause or its supervisory power.[6]

### B.

■ This court reviews Noriega's appeal of the district court's evidentiary rulings under the abuse of discretion standard. *See*

*United States v. Veltmann,* 6 F.3d 1483, 1491 (11th Cir.1993).

### 1.

■ Noriega's first evidentiary claim relates to the district court's exclusion of evidence regarding the intelligence services Noriega allegedly provided to the United States prior to his indictment. The district court made this ruling before trial pursuant to the Classified Information Procedures Act ("CIPA"), 18 U.S.C.App. 3 §§ 1–16. "[The] CIPA requires defendants who expect to disclose classified information to notify the court and the government of their intention to do so." *United States v. Baptista–Rodriguez,* 17 F.3d 1354, 1363 (11th Cir.1994). Upon the government's motion, the district court then must determine whether such evidence would be admissible at trial under the Federal Rules of Evidence. As this court has held:

> [t]he district court may not take into account the fact that evidence is classified when determining its "use, relevance, or admissibility." ... If the classified information is admissible under ordinary evidentiary analysis it becomes the government's task to propose an alternative way of conveying the information to the jury that is less damaging to national security.

*Id.* at 1364 (citations omitted).[7]

In this case, Noriega gave notice of his intent to use classified information regarding his intelligence work for the United States to rebut the government's assertion that he had unexplained wealth.[8] The government objected to any disclosure of the purposes for which the United States had paid Noriega. In pre-trial proceedings, the government offered to stipulate that Noriega had received

---

**6.** The district court held that *Payner* did not limit its supervisory power to refuse jurisdiction due to the government's mistreatment of third parties, but that Noriega's claim raised a non-justiciable *political question.* Because we conclude that, under *Payner,* the district court could not have exercised its supervisory power to dismiss the indictment against Noriega based on injuries to third parties, we need not determine whether the district court correctly applied the political question doctrine.

**7.** The district court thereafter must determine whether "the [government's] alternate submis-

sion will provide the defendant with substantially the same ability to present his or her defense as would disclosure of the specific classified information." *Id.* at 1363. If the district court concludes that the government's proffered substitution will not allow the defendant to litigate the case adequately, then generally, "the government [must] face the dilemma of permitting disclosure or dismissing the charges." *Id.*

**8.** Evidence of unexplained wealth inferentially corroborated testimony that the Medellin Cartel made large payments to Noriega.

approximately $320,000 from the United States Army and the Central Intelligence Agency. Noriega insisted that the actual figure approached $10,000,000, and that he should be allowed to disclose the tasks he had performed for the United States.

The district court held that information about the content of the discrete operations in, which Noriega had engaged in exchange for the alleged payments was irrelevant to his defense. Alternatively, it ruled that the tendency of such evidence to confuse the issues before the jury substantially outweighed any probative value it might have had. The district court's CIPA ruling, however, left Noriega free to present evidence of the fact, amounts, time, source and method of conveyance of money he alleged he had received from the United States. At trial, Noriega declined to submit evidence regarding monies he allegedly received from the United States, because, he now contends, it would not have appeared credible to the jury absent the excluded details regarding the actual services he had performed.[9]

We conclude first that, contrary to Noriega's suggestions, the district court judged the admissibility of the evidence in question solely under the standards set out in the Federal Rules of Evidence. The record does not indicate that the district court misunderstood or ignored its obligation to apply normal evidentiary principles despite the classi-

fied nature of the material at issue. With this understanding, we turn to an evaluation of the district court's ruling.

Our review leads us to conclude that information regarding the purposes for which the United States previously paid Noriega potentially had some probative value. Specifically, had Noriega testified that he had received $10,000,000 from the United States, and had the government then rebutted that testimony by presenting evidence that it had paid Noriega $320,000, evidence regarding what Noriega did for the United States might have helped the jury determine which of the two payment totals was more credible. To the extent that the proffered evidence on the intelligence operations showed that the United States had engaged Noriega to carry out significant duties, the jury might have inferred that he had received the higher figure, rather than the lower sum. Thus, the district court may have overstated the case when it declared evidence of the purposes for which the United States allegedly paid Noriega wholly irrelevant to his defense.

The potential probative value of this material, however, was relatively marginal. Evidence of the purposes for which monies allegedly are given does not aid significantly in the determination of the fact and amount of such purported payments.[10] Further, and more importantly, the district court correctly

9. The government argues that during the CIPA proceedings Noriega's position continually evolved, and that this evolution reveals why Noriega chose not to offer testimony on this point. The government notes that Noriega initially referred to monies he allegedly derived from the United States as if they were paid directly to him. Later, he intimated that the payments in question actually were directed to the government of Panama, but "were made available" to him through his position of authority. As a result, the government asserts that Noriega opted not to present evidence of the alleged payments because to do so would have entailed an admission of theft on his part. For purposes of this appeal, we accept that Noriega failed to present evidence of payments from the United States because of the district court's relevance rulings, not due to strategic concerns. The government also contends that Noriega failed to make an adequate proffer of how, where, when or by whom he was paid, and accordingly, that the district court could not have determined the relevance, if any, of information regarding why Noriega was paid. We

acknowledge that Noriega generally failed to present the district court with concrete situations it could evaluate easily. Given, however, that the district court deemed itself sufficiently apprised of the dispute to issue a virtual blanket ruling excluding evidence regarding the content of the services provided by Noriega for the United States, we will assume arguendo that Noriega created an adequate record on this issue.

10. The value of this evidence was limited further by the fact that Noriega had unexplained wealth beyond the sum he claimed to have derived from the United States. The record indisputably indicates that Noriega's known fortune exceeded $23,000,000 and that non-drug sources and interest accounted for only $6,000,000 to $10,000,000 of that total. As a result, even if the jury had credited Noriega's claim that he had received $10,000,000 from the United States, the record still would show that Noriega had between $3,000,000 and $7,000,000 in unexplained wealth. That fact would have supported the same negative inference as to which he objects.

recognized that the admission of evidence regarding the nature of Noriega's assistance to the United States would have shifted unduly the focus of the trial from allegations of drug trafficking to matters of geo-political intrigue. Accordingly, we cannot conclude that the district court abused its discretion when it determined that the probative value of the proffered material was outweighed substantially by the confusion of issues its admission would have caused. *See* Fed. R.Evid. 403.

### 2.

Noriega's second evidentiary assignment of error also fails. At trial, Noriega presented the testimony of an officer from the Panamanian Defense Forces who denied that Noriega trafficked in drugs. Noriega contends that the district court reversibly erred when it allowed the government to cross-examine the officer about an incident in which he risked his life to protect Noriega from a coup attempt. The district court held that such an inquiry was relevant to show the witness's loyalty toward and bias in favor of Noriega; we agree.

Noriega insists that even if this evidence had probative value, the district court nonetheless abused its discretion because the testimony at issue unfairly prejudiced Noriega by showing that his own soldiers wanted to oust him from power. As the government noted, Noriega brought out evidence of coup attempts against him during his own questioning of witnesses. Further, the cross-examination about which Noriega complains consumed relatively little time before the jury. As a result, any unfair prejudice associated with this line of questioning was, at most, minimal, and certainly did not outweigh substantially the probative value of the solicited evidence. *See* Fed.R.Evid. 403. Accordingly, we hold that the district court's handling of this matter did not constitute an abuse of discretion.

### IV.

The remaining issues before this court relate to claims raised in Noriega's motion, timely filed in district court pursuant to Fed. R.Crim.P. 33, for a new trial based on newly discovered evidence. Noriega first sought a new trial based on his discovery of an undisclosed cooperation agreement between the government and a non-witness, Lucho Santacruz–Echeverri, an associate of one of the Medellin Cartel's rival drug-trafficking organizations from Cali, Colombia (the "Cali Cartel"). As part of this pact, the government agreed to move the district court, pursuant to Fed. R. Crim. P. 35, to reduce Santacruz–Echeverri's sentence in an unrelated case, if Santacruz–Echeverri helped to procure the surrender and cooperation of Ricardo Bilonick in connection with government's case against Noriega. Bilonick later turned himself in and testified against Noriega, and, in fulfillment of the deal at issue, the government helped Santacruz–Echeverri secure a sentence reduction.

In its responsive pleading before the district court, the government contended that it had no duty to reveal such non-witness, cooperation agreements to Noriega, at least absent evidence that a witness benefitted from or otherwise was influenced by the third-party pact. The government also informed the court that, as it was preparing to address Noriega's new trial motion, it received information that the Cali Cartel paid Bilonick $1,250,000 to testify against Noriega. In his reply to the government's response, Noriega outlined his belief that these bribery allegations further supported his new trial motion.

Following an evidentiary hearing, the district court ruled that the government had no duty to disclose to Noriega its agreement with Santacruz–Echeverri. The district court alternatively concluded that even if the government should have revealed its deal with Santacruz–Echeverri, its suppression of the agreement was not sufficiently material to warrant a new trial. The district court also determined that the post-conviction bribery allegations failed to satisfy the requirements for the granting of a new trial. Noriega appeals these rulings.

This court will not overturn a district court's denial of a motion for a new trial based on newly discovered evidence absent an abuse of discretion. *See United States v. Swindall,* 971 F.2d 1531, 1555 (11th

Cir.1992), *cert. denied,* 510 U.S. 1040, 114 S.Ct. 683, 126 L.Ed.2d 650 (1994). The district court's underlying determinations regarding prosecutorial misconduct involve mixed questions of law and fact, and therefore, are subject to *de novo* review. *See generally Hays v. Alabama,* 85 F.3d 1492, 1498 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1262, 137 L.Ed.2d 341 (1997).

### A.

██ The Supreme Court has held that "regardless of request, favorable [exculpatory or impeachment] evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (citations omitted). Accordingly, to secure a new trial based on his discovery of the government's agreement with Santacruz–Echeverri, Noriega must first establish that such non-witness deals constitute proper impeachment material. Noriega insists that they do because, had he known about the government's pact with Santacruz–Echeverri, he would have cross-examined Bilonick about whether and how Santacruz–Echeverri induced Bilonick to cooperate with the government.

The government responds that because Bilonick was not a beneficiary of its agreement with Santacruz–Echeverri, and Bilonick maintained to the government, prior to trial, that he chose to cooperate of his own accord, not due to any efforts by Santacruz–Echeverri, its deal with Santacruz–Echeverri lacks impeachment value. Noriega notes that the government's dismissal of the possible inference that Santacruz–Echeverri influenced Bilonick conflicts with its decision to move for a sentence reduction for Santacruz–Echeverri

in his unrelated case. Indeed, at the hearing on the government's Rule 35 motion for Santacruz–Echeverri, the government stated that it "could not convince [Bilonick] to surrender himself, and [it] didn't have a way to arrest him. There were no charges outstanding in Panama and Panama would not itself arrest him. So, whatever [Santacruz–Echeverri's attorney] and Santacruz[-Echeverri] did, they were successful in." [11] In this statement, the government essentially acknowledged that Santacruz–Echeverri *may have done something* to secure Bilonick's cooperation against Noriega.

In sum, the government gave Santacruz–Echeverri an incentive to induce Bilonick to testify against Noriega, and credited Santacruz–Echeverri with achieving that object, but it concealed that information from Noriega. With knowledge of these facts, Noriega would have had more than a good-faith basis to question Bilonick at trial about what, if any, inducements he received from Santacruz–Echeverri.[12] Bilonick could have denied that Santacruz–Echeverri influenced improperly, or at all, his decision to cooperate. The jury then could have determined: (1) whether it believed Bilonick's denial of third-party pressure; and (2) the degree to which it should discount Bilonick's testimony about Noriega, if it inferred that Bilonick acted at Santacruz–Echeverri's behest.

Under the government's reasoning, a defendant apparently is entitled to have a jury make these determinations only if the witness in question admits to the government that he or she was induced to cooperate by a non-witness with whom the government has made a deal. Where, as here, the witness at issue has entered into his own cooperation agreement with the government, and knows that the value of his testimony, upon which his chances for a more lenient sentence largely hinge, would be undercut by such an

---

11. This quotation comes from the transcript of the Rule 35 hearing in *United States v. Santacruz–Echeverri,* No. 89–361–Cr–WMH (S.D.Fla. October 2, 1992). It appears in the record at 2dSupp.R2:1594, App. 4 at 5 ("Record Volume:Docket Number, Page").

12. The government also knew that, while it was negotiating this deal, Santacruz–Echeverri's attorney offered to pay Bilonick's legal fees and the

costs of relocating his family. Although the record indicates that the government informed Santacruz–Echeverri's attorney that such inducements were not allowable, this information would have provided a basis for Noriega to impeach Bilonick if, when cross-examined, he denied that Santacruz–Echeverri attempted to influence him.

admission, the witness has a strong motive to give the government false information about any third-party inducements. Further, the government has an equally powerful incentive to accept, even willfully blindly, the witness's denial of outside pressure, so that it can withhold this information from the defendant. Such a regime appears inconsistent with the policy underlying the government's witness-incentive disclosure obligations, which this court has described as "ensur[ing] that the jury know[s] the facts that *might* motivate a witness in giving testimony . . . ." *Smith v. Kemp,* 715 F.2d 1459, 1467 (11th Cir.) (emphasis added), *cert. denied,* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983).

Assuming that, for the reasons cited above, the government's pact with Santacruz–Echeverri would have afforded Noriega a basis to impeach Bilonick, Noriega still cannot win a new trial unless he satisfies the *Kyles* materiality test. To do so, Noriega must show the existence of a "reasonable probability" that the disclosure of the suppressed information would have led to a different result at trial. *Kyles,* 514 U.S. at 433, 115 S.Ct. at 1565. "The question is not whether the defendant would more likely than not have received a different verdict with the [concealed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. at 1566. Because the evidence at issue only would have facilitated *further* impeachment of *one* witness (out of more than forty called by the government) who gave testimony *corroborative* in nature related to one area of the case, we affirm the district court's conclusion that the government's suppression of its deal with Santacruz–Echeverri fails to satisfy *Kyles*'s second prong.

Bilonick was questioned thoroughly at trial about his plea agreement with the government. As a result, the jury knew that Bilonick had a compelling motive to testify against Noriega, i.e., he hoped to receive a lesser prison term based on his cooperation. If the government had disclosed its agreement with Santacruz–Echeverri, Noriega, through his cross-examination of Bilonick, might have been able to raise an inference in the jury's mind that, by testifying against Noriega, Bilonick *also* hoped to gain benefits from Santacruz–Echeverri. This cumulative impeachment regarding Bilonick's "incentives" for cooperating likely would not have led the jury to scrutinize his testimony much more than it already had, and thus, the suppression of that information does not call the verdicts against Noriega into question. *See United States v. Williams,* 81 F.3d 1434, 1439–40 (7th Cir.1996) (ruling that newly discovered impeachment evidence regarding government's provision of gifts and jailhouse privileges for witnesses "was unlikely to make a difference" to the jury's credibility determinations given impeachment of witnesses at trial regarding their hopes for immunity or "punishment discounts" based upon their testimony). *See also United States v. Amiel,* 95 F.3d 135, 145 (2d Cir. 1996) (affirming district court's denial of new trial motion where suppressed "impeachment evidence was cumulative").

The fact that the government's nondisclosure related only to a single corroborative witness's testimony from one area of the case also supports the district court's decision to deny Noriega's new trial motion. The government did not rely upon Bilonick to establish the elements of any of the charges against Noriega. *See Carter v. Johnson,* 110 F.3d 1098, 1105 (5th Cir.1997) (rejecting *Kyles* claim premised upon suppressed impeachment evidence related to one witness because "[t]he prosecution did not rely upon [that witness]'s testimony to establish the essential elements of the offense, but merely to corroborate the [defendant's] confession"); *Amiel,* 95 F.3d at 146 ("Moreover, independent evidence tied each defendant to the criminal conduct, such that cumulative impeachment evidence against [two witnesses] does not undermine our confidence in the outcome of the trial."). Because, "ultimately, [as the Supreme Court explained in *Kyles* ] sufficiency of the evidence is not the 'touchstone' under the *Brady* line of cases," *United States v. Gonzalez,* 93 F.3d 311, 316 (7th Cir.1996), we note that the record contains not merely evidence from sources other than Bilonick *sufficient* to sustain Noriega's convictions, but also significant additional corroboration of the principal testimony on all

the key points in the government's case. *See id.* at 317 ("Because there is *independent corroborating evidence* of the guilt [of the defendants], there is no reasonable probability that the result of the trial would have been different had the undisclosed impeachment material been disclosed prior to trial.").

As Noriega recognizes, the government relied upon Bilonick to substantiate the testimony of other witnesses, most notably Carlos Lehder, about the Medellin Cartel's use of the Panamanian INAIR airline which Bilonick nominally owned.[13] The government could not rely upon Bilonick more extensively because he neither served as a Medellin Cartel insider (as had Lehder), nor dealt directly with Noriega (as did witnesses, such as Floyd Carlton, Luis Del Cid and Amjad Awan). As a result, Bilonick's testimony had no bearing on many aspects of the case, including Noriega's (and his associates') meetings with Medellin Cartel members, numerous non-INAIR drug, money and ether shipments and Noriega's handling of payments he received from the Medellin Cartel.[14]

Accordingly, we conclude that the district court did not abuse its discretion when it denied Noriega a new trial based on the government's suppression of its cooperation agreement with Santacruz–Echeverri.

**B.**

Noriega also asserts that he deserves a new trial because after his conviction two people came forward with information that Bilonick received $1,250,000 from the Cali Cartel for testifying against Noriega.[15] In Noriega's view, this revelation shows that Bilonick gave perjured, or at least highly misleading, testimony at Noriega's trial. Specifically, Noriega contends that Bilonick deceived the jury when he "affirmed that all promises made to him were reflected in [his] plea agreement ... [and] that his surrender to the United States had been completely voluntary." Appellant's Supp. Br. at 18. According to Noriega, the bribery allegations establish that Bilonick knew of other promises and acted not of his own volition, but rather because he was paid to do so. Noriega argues that the government violated his due process rights when it failed to correct this false and/or highly misleading testimony. Noriega points to no evidence that the government had actual knowledge of the alleged payment by the Cali Cartel, but he insists that it should be charged with constructive knowledge of the bribe.

The Supreme Court long has held that " 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice".' " *DeMarco v. United States,* 928 F.2d 1074, 1076 (11th Cir.1991) (quoting *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104

13. Although Noriega acknowledges that Bilonick's testimony related primarily to drug-trafficking activities involving INAIR, he fails to argue that the disclosure of the additional impeachment material regarding Bilonick "would have [led to Noriega's being] acquitted of particular counts, as opposed to being acquitted of all the charges against [him]...." *Williams,* 81 F.3d at 1441. We agree with the Seventh Circuit that, under these circumstances, "[i]t was not an abuse of discretion [for the district court] to repel [such a] broad attack." *Id.*

14. By the foregoing analysis, we do not suggest that Bilonick's testimony was irrelevant to the government's case against Noriega. Indeed, as Noriega points out, at Bilonick's sentencing hearing, the government and the district court credited Bilonick with providing significant corroboration regarding the INAIR portion of the drug-trafficking scheme. That fact, however, does not lead us, upon learning that the govern-

ment suppressed one potential basis for impeaching Bilonick, to lose confidence in the jury's verdicts, as required under *Kyles. See Williams,* 81 F.3d at 1441 ("[T]he fact that the prosecution was trying to bolster its case [by concealing this information] does not prove that without that bolstering the case would have been weak. Otherwise the case law would not require, as it does, a separate inquiry into the prejudicial effect of the prosecutorial misconduct.").

15. Both individuals, whose identities were concealed for security purposes, testified at the evidentiary hearing. The first witness stated that, on behalf of the Cali Cartel, he personally delivered $250,000 to Bilonick before Bilonick surrendered and later transferred $1,000,000 to Bilonick's wife after Bilonick testified against Noriega. The second witness averred that he heard Cali Cartel members discussing a plan to bribe someone with a "foreign name" to cooperate with the government against Noriega.

(1972), quoting *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935)). As a result, "due process is violated when the prosecutor, although not soliciting false evidence from a Government witness, allows it to stand uncorrected when it appears." *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir.1977) (citing *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). The violation arises even if the "false testimony goes only to the credibility of the witness. . . ." *Id.* "Where either [the government solicits false or misleading testimony or fails to correct it], the falsehood is deemed to be material [and thus, to warrant a new trial] 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir.1995) (citations omitted) (ruling that "standard of materiality [for such claims] is equivalent to the *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), 'harmless beyond a reasonable doubt' standard"). Noriega has shown no such wrong in this case.

First, Noriega mistakenly treats the alleged bribe as an established fact, rather than as a disputed matter.[16] Further, even if one assumes that the Cali Cartel did bribe Bilonick, the portions of Bilonick's trial testimony cited by Noriega do not constitute a denial of such payments. For example, Noriega charges that Bilonick falsely testified that his plea agreement contained all the promises made to him. Read in context, the record reflects that Bilonick was responding to questions regarding guarantees made by the *government;* he was not asked about promises generally. Bilonick's second statement cited by Noriega as misleading, i.e., that Bilonick waited to surrender until after the Medellín Cartel heads went into custody in Colombia, does not exclude the possibility that he received compensation from the Cali Cartel. Finally, Noriega has cited no authority to support the application of the various agency theories, by which he seeks to impute to the government knowledge of the alleged bribe, in this context. Although the government appears to have treaded close to the line of willful blindness,[17] the crossing of which might establish constructive knowledge, we decline to charge the government with prior cognizance of the alleged payment, particularly given Bilonick's continued disavowal of it. *See United States v. Michael*, 17 F.3d 1383, 1385 (11th Cir.1994) ("It is axiomatic that only the knowing use of false testimony constitutes a due process violation.").[18]

Because the record fails to support a claim of prosecutorial misconduct in this regard, to win a new trial based on the post-conviction bribery allegations, Noriega must satisfy the general standard for newly discovered evidence. *See United States v. Garcia*, 13 F.3d 1464, 1472 (11th Cir.) (ruling that a district court may grant a new trial based on newly discovered evidence "only if: (1) the evidence was in fact discovered after trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence was not merely cumulative or impeaching; (4) the evidence was material; and (5) the evidence was of such a nature that a new trial would probably produce a new result"), *cert. denied sub nom., Chaves v. United States*, 512 U.S. 1226, 114 S.Ct. 2723, 129 L.Ed.2d 847 (1994). Evidence regarding the bribing of a witness, although disturbing, clearly does constitute impeachment material, and therefore, Noriega cannot satisfy the *Garcia* standard. *See United States v. Starrett*, 55 F.3d 1525, 1554 (11th Cir.1995) ("Failure to meet any one of

---

16. According to the government, Bilonick denies receipt of any such payment.

17. The record shows that, prior to Bilonick's surrender, Santacruz–Echeverri's attorney informed the government that the Cali Cartel had offered to protect Bilonick's family from reprisals resulting from Bilonick's testimony against Noriega. A government attorney's memorandum from that meeting indicates that he declined to ask "whether this security arrangement included support payments." 2dSupp.R4:247 ("Record

Volume:Page"). If, instead, the government had pursued that question, its position in responding to this challenge from Noriega would appear much stronger.

18. Because we conclude that Noriega failed to state a valid claim of prosecutorial misconduct, we need not consider whether he could show a reasonable likelihood that the alleged false testimony affected the jury's judgment. *See Alzate*, 47 F.3d at 1110.

these elements will defeat a motion for new trial."), *cert. denied sub nom., Sears v. United States,* —— U.S. ——, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996). Accordingly, we find no abuse of discretion by the district court in denying Noriega a new trial on this basis.

### V.

For all the foregoing reasons, Noriega's convictions are AFFIRMED, and the district court's order denying Noriega's motion for a new trial is AFFIRMED.