[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13528
_____

D.C. Docket No. 8:08-cr-00172-MSS-EAJ-5


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

SIMON ANDREW ODONI,
PAUL ROBERT GUNTER,
a.k.a. Paul Baxter,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(January 13, 2015)


Before WILSON, ROSENBAUM and BLACK, Circuit Judges.

BLACK, Circuit Judge:

Following a joint trial, Appellants Simon Andrew Odoni and Paul Robert Gunter were convicted and sentenced on multiple counts related to two international investment fraud schemes. Each appellant raises significantly different issues on appeal. We therefore divide this opinion into two sections, the first pertaining to Odoni and the second to Gunter.

## SIMON ANDREW ODONI

Odoni raises four arguments on appeal. He argues (1) the district court lacked personal jurisdiction over him; (2) there was insufficient evidence to convict him; (3) the district court erred in denying his motion for a new trial; and (4) his 160-month sentence is unreasonable. Upon review, we affirm.

## I.  BACKGROUND

We begin with a brief summary of the two schemes underlying Odoni's convictions. We include additional relevant facts in our discussion of each issue.

*A.     Fraudulent-Stock Scheme*

Lawrence Hartman and Richard Pope began operating a fraudulent-stock scheme in 2003. Hartman would procure valueless United States shell companies that did no real business but appeared to be legitimate publicly-traded entities. Pope would then recruit salespeople to sell stock in those companies to investors. Hartman and others created brochures, websites, and press releases containing fabricated information meant to portray the shell companies as legitimate

2

investment opportunities.  Pope's salespeople, called "advisors," would call potential investors, mostly in the United Kingdom, and try to sell them stocks in the shell companies using "scripts" based on fabricated information intended to make the companies look more attractive.

Odoni played two key roles in the fraudulent-stock scheme.  First, he managed Bishop and Parkes, an advisor group that employed a sales floor of advisors, *i.e.*, individuals who used fabricated scripts to sell stocks in the valueless shell companies.  Odoni's responsibilities at Bishop and Parkes included managing the sales floor, helping advisors "write good scripts," and ensuring advisors were "chasing money in."  In exchange for his work, Odoni received a portion of the investors' funds.

Second, Odoni served as the CEO and sole director of Nanoforce Incorporated, one of the valueless shell companies Hartman procured.  Salespeople told investors that Nanoforce was a technology business, although, in reality, Nanoforce did no business.  In early May 2005, Odoni helped create a website for Nanoforce and told Hartman "[i]t would probably look better" to use a webhosting company located in the United States.  In June 2005, Odoni circulated a Nanoforce press release to Paul Gunter, Richard Pope, and Zibiah Gunter, among others.  The press release contained false statements about Nanoforce's business and efforts to expand.  Beginning in mid-2005, Odoni signed board resolutions approving the

3

issuance of Nanoforce stock to investors who had purchased shares.  From May 25, 2005, through December 20, 2005, advisor groups convinced investors to buy more than $12 million of worthless Nanoforce stock.

## B.    Forex Fraud Scheme

In addition to the fraudulent-stock scheme, Odoni also participated in a Forex fraud scheme, which involved the sale of foreign-exchange options. Foreign-exchange options allow investors to speculate on the future prices of major currencies such as the pound, yen, euro, and dollar.[1]

In furtherance of the Forex scheme, Michael Geraud, Jeff Jedlicki, and others created Hartford Management Group, a Barcelona firm that employed salespeople who called potential investors and persuaded them to buy foreign-exchange options.  Legitimate firms selling foreign-exchange options are required to disclose the risks of foreign currency investment and honestly advise investors about the outlook of the foreign currency market.  Hartford Management Group, by contrast, falsified information about future developments in the currency market and told investors only about the profits they could expect to gain from trading in the foreign exchange market without disclosing any of the associated risks. Legitimate foreign currency firms also typically place trade hedges against their

---

[1] For instance, an investor who believes the price of the euro will increase might purchase an option to buy euros in one month for $1.  If the price of the euro rises to $1.50, the investor can exercise his option, buy the euros for $1, and then turn around and sell the euros for $1.50, netting a $0.50 profit per euro.

4

clients' trades, so that if a client is right about the price movement of a currency, the firm has enough money to pay the client back.  Hartford Management Group, on the other hand, "never hedged [its] accounts at all"; they "just rolled the dice that over time the clients would lose."

Odoni participated in the Forex fraud scheme by providing escrow services to Hartford Management Group—that is, he received investor funds and transferred them to a clearing firm.  In this role, Odoni created an escrow company, International Escrow Enterprises, and set up accounts at Bank of America to receive investor funds.  In exchange for providing these escrow services, Odoni collected a 5% escrow fee, which he split with co-defendant Paul Gunter and Richard Pope.  In total, more than $10.7 million of investor funds came through International Escrow Enterprise's bank accounts.

On March 29, 2009, Odoni was brought to the United States from the Dominican Republic for prosecution.  A jury subsequently found Odoni guilty of the following counts related to the schemes:  one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349; one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956; one count of engaging in illegal monetary transactions, in violation of 18 U.S.C. § 1957; ten counts of

mail fraud, in violation of 18 U.S.C. § 1341; and nine counts of wire fraud, in violation of 18 U.S.C. § 1343.

## II.  DISCUSSION

### A.    *Personal Jurisdiction*

Odoni argues the district court lacked personal jurisdiction to try him because the manner in which he was brought to the United States contravened the extradition treaty between the United States and the Dominican Republic.  Odoni contends five armed Dominican agents, acting on a request made by the United States Attorney's Office, abducted Odoni from his home in the Dominican Republic, kept him in jail overnight, and then forced him to board an airplane to Miami, Florida, using a ticket purchased by the United States Marshal Service. When Odoni arrived in Miami, he was met by agents of the United States Secret Service and Immigrations and Customs Enforcement and placed under arrest.

It is well-established that "a criminal defendant cannot defeat personal jurisdiction by asserting the illegality of the procurement of his presence in the relevant jurisdiction—here, the United States." *United States v. Arbane*, 446 F.3d 1223, 1225 (11th Cir. 2006).  This rule, known as the *Ker-Frisbie*[2] doctrine, has one exception for when "an extradition treaty contains an explicit provision

---

[2] The rule comes from a line of cases dating back to *Ker v. Illinois*, 119 U.S. 436, 7 S. Ct. 225 (1886), and *Frisbie v. Collins*, 342 U.S. 519, 72 S. Ct. 509 (1952).

making the treaty the exclusive means by which a defendant's presence may be secured." *Id.* (citing *United States v. Alvarez-Machain*, 504 U.S. 655, 664, 112 S. Ct. 2188, 2194 (1992)).

Odoni argues the extradition treaty between the United States and the Dominican Republic falls within the *Ker-Frisbie* exception. He claims that, under the text of the treaty, formal extradition was the only means by which the United States could procure his presence in the country. As a result, the district court lacked jurisdiction over him.[3]

Odoni cannot demonstrate that the U.S.-Dominican Extradition Treaty required the U.S. agents to obtain his presence through a formal extradition request. The extradition treaty does not, by its express terms, prohibit United States agents from asking the Dominican Republic to deport, expel, or otherwise remove a fugitive outside of the formal extradition process. Article I of the extradition treaty states:

> It is agreed that the Government of the United States and the Government of the Dominican Republic shall, upon mutual requisition duly made as herein provided, deliver up to justice any person who may be charged with, or may have been convicted of any of the crimes specified in [the treaty,] . . . provided that such surrender shall take place only upon such evidence of criminality, as according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offence had been there committed.

---

[3] We review jurisdictional issues *de novo*. *Adams v. Monumental Gen. Cas. Co.*, 541 F.3d 1276, 1277 (11th Cir. 2008).

7

Convention for the Mutual Extradition of Fugitives from Justice, U.S.–Dom. Rep., June 19, 1909, 36 Stat. 2468.

Thus, when one government formally requests extradition and complies with the conditions set forth in the treaty, the other government promises to fulfill that request. But the treaty goes no further. It does not expressly or implicitly provide that extradition is the exclusive mechanism for procuring individuals from the Dominican Republic for prosecution. It simply embodies a promise to extradite individuals when certain conditions are met.[4] *See United States v. Noriega*, 117 F.3d 1206, 1213 (11th Cir. 1997) ("Under *Alvarez–Machain*, to prevail on an extradition treaty claim, a defendant must demonstrate, by reference to the *express language* of a treaty and/or the established practice thereunder, that the United States affirmatively agreed not to seize foreign nationals from the territory of its treaty partner.") (emphasis added)). The district court therefore did not err in denying Odoni's motion to dismiss his indictment for lack of personal jurisdiction.

B.    *Sufficiency of the Evidence*

Odoni next argues there was insufficient evidence to prove he knowingly or intentionally participated in the schemes to defraud underlying his convictions. Odoni claims the evidence showed only that he was an oblivious pawn in those

---

[4] None of the other language in the treaty to which Odoni points reflects an affirmative agreement between the United States and the Dominican Republic that the extradition treaty would be the sole mechanism for procuring individuals for prosecution.

schemes. We review sufficiency of the evidence claims "in the light most favorable to the government and draw all reasonable inferences and make all credibility determinations in support of the jury's verdict." *United States v. Thomas*, 987 F.2d 697, 701 (11th Cir. 1993) (internal quotations omitted). We will reverse a conviction only if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).

The evidence that Odoni knowingly and intentionally engaged in the schemes to defraud was more than sufficient; it was overwhelming. The Government presented direct evidence of Odoni's knowledge through the trial testimony of Richard Pope and Michael Geraud. Richard Pope, who was an old friend and business associate of Odoni's, testified he talked to Odoni about the schemes and "Odoni knew full well what was going on and he was quite happy to take the proceeds." Michael Geraud testified he guided Odoni through the Hartford Management Group office, the main Barcelona location for the Forex scheme, and "[p]retty much walked him through [the operation from] A to Z." A jury could find this testimony credible. *See United States v. Prince*, 883 F.2d 953, 959 n.3 (11th Cir. 1989) ("Weighing the credibility of witnesses . . . is within the province of the jury, and the jury is free to believe or disbelieve any part or all of the testimony of a witness.").

9

The Government also presented ample circumstantial evidence of Odoni's knowledge. For example, the Government established that Odoni managed the sales floor at Bishop and Parkes, where advisors were pitching stocks in valueless shell companies to unwitting investors under Odoni's supervision. A jury could infer Odoni knew the fraudulent nature of the operation because he was a central part of it, even helping write some of the fraudulent scripts. A jury could also infer Odoni knew the stocks he sold were worthless because he was the CEO of Nanoforce, a fictitious shell company similar to the ones being pitched on his sales floor. As the CEO of Nanoforce, Odoni knew the company did not conduct any legitimate business. Odoni nonetheless distributed a false press release about Nanoforce's purported activities, helped set up a website to make the business look more legitimate, and signed board resolutions authorizing Nanoforce stock issuances. A jury could readily conclude Odoni took these steps because he was a knowing participant in the fraudulent schemes.

Given the totality of the record, the evidence was sufficient to sustain Odoni's convictions.

## C.    *Motion for a Mistrial*

Odoni's third argument is that the district court should have granted his motion for a new trial because the district court violated Federal Rule of Criminal Procedure 43 by holding discussions on how to respond to a jury question while

10

Odoni was not present.  Rule 43 states "the defendant must be present at . . . every trial stage."  Fed. R. Crim. Pro. 43(a)(2).  "[N]ot every violation of Rule 43(a) requires reversal."  *United States v. Cuchet*, 197 F.3d 1318, 1320 (11th Cir. 1999).

During the second day of deliberations, the jury sent the district court a note stating, "We are missing exhibit 1133B, could we please have a new copy."  No Exhibit 1133B, however, was introduced at trial.  The district court held a phone conference with both Odoni's attorney and the prosecutor.  Odoni, however, was not personally included on the call.  After hearing from both attorneys, the district court ultimately instructed the jury that "[t]here is no Exhibit 1133B.  You have all the exhibits that have been admitted.  Thank you."

Assuming, *arguendo*, Odoni's absence from the conference call violated Rule 43, any such error was harmless.  *See Cuchet*, 197 F.3d at 1320-21.  As explained above, the evidence of Odoni's guilt was overwhelming.  *United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999) ("Overwhelming evidence of guilt is one factor that may be considered in finding harmless error.").  Moreover, Odoni's absence from the phone conference did not prejudice him.  The district court answered the jury's question by correctly instructing them they had all the exhibits admitted into evidence.  There is no basis in the record for Odoni's claim that the jury's question meant the jurors did not consider all of the exhibits.  The jury was instructed to consider all the evidence in the case and "[w]e presume that

juries follow the instructions given to them." *United States v. Lopez*, 649 F.3d 1222, 1237 (11th Cir. 2011).

D.    *Odoni's Sentence*

Finally, Odoni argues his 160-month sentence is substantively unreasonable because the district court did not adequately consider several of the 18 U.S.C. § 3553(a) factors, including his personal history, diminished role in the offense, and proportionality of his sentence compared to those of more culpable co-defendants.  We review sentencing decisions for abuse of discretion.  *United States v. Irey*, 612 F.3d 1160, 1188-89 (11th Cir. 2010) (en banc).  We will vacate a sentence only if we "are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  *Id.* at 1190 (internal quotations omitted).

Odoni's 160-month sentence is not substantively unreasonable.  Odoni is not similarly situated to the other defendants who, for example, provided substantial assistance to the Government or were not convicted of the same crimes.  *See*, *e.g.*, *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) ("[D]efendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial.").  Moreover, the district court considered Odoni's personal

history, his role in the offense, and the need to avoid unwarranted sentencing disparities.  In light of all the circumstances, Odoni's sentence was substantively reasonable.

## *PAUL ROBERT GUNTER*

Gunter provided escrow services and managed bank accounts in connection with the two investment-fraud schemes.  He raises two issues on appeal.  The only issue that warrants discussion[5] is whether the district court erred in denying Gunter's motion to suppress electronic evidence (and the fruits thereof), which the United States received directly from the United Kingdom's Serious Fraud Office (SFO) in connection with an ongoing international investigation into the fraud schemes, and then searched without obtaining a warrant.  We affirm.

## I.  BACKGROUND

### A.    *The Investigation*

Gunter's electronic data files were seized as part of an international investigation into the fraudulent-stock scheme.  In 2004, the Norfolk Constabulary, an independent police force in the UK, began investigating a suspicious bank transaction.  The Norfolk Constabulary suspected about eight companies were involved in the transaction, but it was not sure how, and it lacked the resources to

---

[5] The other issue raised by Gunter's appeal is whether the district court erred in denying his motion for a new trial.  We conclude this issue lacks merit and requires no further discussion.

adequately investigate the case.  Accordingly, in April 2005, the Norfolk Constabulary asked the SFO to take on the case.  The SFO assumed the lead, but continued to collaborate with local police in Norfolk and Suffolk.

The SFO also worked with foreign authorities in Iceland and Spain on the investigation.  In August 2005, the SFO sent an Interpol[6] request and a letter rogatory[7] to the Second Unit of Financial Crimes with the Spanish National Police, requesting information on certain individuals and companies in Barcelona that the SFO believed were connected to so-called "boiler rooms"[8] that were selling shares to victim-investors.  The Second Unit of Financial Crimes took steps to investigate these individuals and companies, but were unable to locate most of them.  Meanwhile, on October 5, 2005, the SFO conducted approximately fifteen simultaneous searches in the United Kingdom, including locations in Norfolk, Suffolk, Kent, Manchester, Cambridge, and London.

---

[6] "Interpol is the common name of the International Criminal Police Organization, a 190–country intergovernmental organization that facilitates international police cooperation." *Lehman v. Lucom*, 727 F.3d 1326, 1329 n.2 (11th Cir. 2013) (quotation omitted); *see also* Black's Law Dictionary (10th ed. 2014) (defining Interpol as "[a]n international law-enforcement group founded in 1923" that "gathers and shares information on transnational criminals for more than 180 member countries").

[7] A "letter rogatory" is "[a] document issued by one court to a foreign court, requesting that the foreign court (1) take evidence from a specific person within the foreign jurisdiction or serve process on an individual or corporation within the foreign jurisdiction and (2) return the testimony or proof of service for use in a pending case."  Black's Law Dictionary (10th ed. 2014).

[8] The term "boiler rooms" refers to groups of people making cold calls to potential investors to make sales pitches regarding fraudulent investment opportunities.

Around the end of October or beginning of November 2005,[9] a significant development in the investigation occurred in Spain, when Spanish forensic police discovered an abandoned rental car containing, among other things, nine laptops and nineteen bags of documents, including bank account and business documents. The forensic police gave the materials from the abandoned car to the Second Unit of Financial Crimes. That unit reviewed the materials and made two discoveries relevant to the SFO's investigation: (1) some of the bank documents contained the names of the British citizens and companies on whom the SFO had requested information; and (2) the abandoned car had been rented by Fahim Kahan, one of the individuals whom the SFO was looking for in Spain.

In March 2006, the Spanish police sent seven boxes of evidence to the SFO. SFO investigators opened each box, one by one, and methodically inspected their contents. They discovered scripts for boiler rooms and notebooks filled with handwriting, which identified the names of boiler rooms, investors, and the volumes of shares bought or money invested. SFO investigators then "bagged and tagged" the materials for booking into its exhibit store to be used later as evidence. As part of the booking process, each document was scanned and put into an online system.

---

[9] Although a witness testified at trial these events occurred in 2006, it is clear from the record they actually occurred in 2005.

15

At some point, the SFO decided to search several offices and dwellings in Barcelona for evidence and to interview various individuals in Spain. Accordingly, in late 2006, SFO investigators made two trips to Spain. During the first trip, SFO investigators met with a Barcelona police officer and discussed the logistics of carrying out the operation in Spain. During the second trip, in November 2006, Spanish police, armed with a list from the British authorities detailing the companies and documents in which they were interested, simultaneously executed six search warrants in Barcelona at the SFO's request. Members of the SFO investigative team and the Norfolk Constabulary were part of the task force that executed the searches and identified relevant documents.

In total, the Spanish task force seized approximately fifty computers and numerous boxes of documents from the six search locations. The Spanish task force did not, however, actually review the seized material: its only role was to locate the boiler rooms. Instead, the SFO was responsible for investigating the actual fraud. Thus, the Spanish police stored the materials in a locked, windowless office, to which SFO investigators were given access. After analyzing the material received from the Spanish police, SFO investigators continued arresting and interviewing people in England. The SFO investigators also circulated a list of people who were "wanted on all ports." Individuals on this list were identified on

16

a national computer and were to be stopped and interviewed if they tried to enter or leave the country.  Gunter was on the "wanted on all ports" list.

B.    *Gunter's Arrest in the UK and Seizure of His Belongings*

On April 13, 2007, Gunter arrived at Gatwick Airport, an international airport south of London.  He was arrested because he was on the British "wanted on all ports" list.  After he was arrested, Gunter was taken to Crowley police station, where he was detained overnight, and then interviewed the following morning by Paul Cook, a police officer with the Norfolk Constabulary Fraud Squad.  Cook also took six items that were seized from Gunter when he was arrested:  two mobile phones, a laptop computer, a thumb drive,[10] some photo CDs, and a camera.

Cook took the six seized items back to his office and placed them in the Norfolk Constabulary's exhibit store.  With regard to Gunter's thumb drive, Cook did not personally analyze its contents because "[t]he procedure in England is that an item of that description would be sealed in a bag and it would only be opened or examined by a specialist"—that is, a computer expert from the SFO.  Once the thumb drive reached the SFO computer expert, that expert "would examine . . . and

---

[10] A thumb drive, also known as a memory stick, is a portable device capable of storing large quantities of electronic data.

copy it." On June 4, 2007, Cook delivered the seized evidence to the SFO in London.

## C.    *The Forensic Analysis of Gunter's Data Files*

On September 7, 2007, Assistant IT Forensic Investigator Peter Littler, who worked in the Digital Forensic Unit at the SFO and had three years of experience working with networked and personal computers, signed out Gunter's laptop computer and thumb drive from the SFO's Exhibits and Records Office and created image copies of them.[11] Although Investigator Littler did not testify at trial, the record contains a signed witness statement from him. In his statement, Littler explained that "[d]uring analysis [of the laptop computer] the date/time of the computer settings was found to be incorrect." Investigator Littler also stated he compiled "[c]ase notes (hard copy and electronic) . . . during the analytical process," which he "held for production if required."[12] Following Investigator Littler's imaging and analysis, the SFO shared the forensic images with the City of London Police, who were investigating a related fraud scheme.

On November 1, 2007, Senior Special Agent Anthony Cerreta (SSA Cerreta) of the U.S. Department of Homeland Security, Bureau of Customs and Border

---

[11] An "image copy" is a copy that "duplicates every bit and byte on the target drive including all files, the slack space, Master File Table, and metadata in exactly the order they appear on the original." Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 541 (2005)).

[12] Investigator Littler's actual case notes are not in the record.

Protection, received image copies of the data files from Gunter's laptop and thumb drive directly from the British authorities, which he inventoried as "CD R (From memory Stick)" and "DVD R (From Laptop)." On November 9, 2007, Special Agent M. Anthony Magos (SA Magos) of the U.S. Secret Service also received images of the seized data files directly from the City of London Police, also in the form of a CD-R and a DVD-R, which he inventoried as well. Federal agents began reviewing Gunter's data files—at least, the thumb drive—in late 2007 without a search warrant.[13]

On March 12, 2008, SA Magos applied for a warrant to search Gunter's business premises in the United States. On that same day, SSA Cerreta applied for a warrant to search Gunter's Online Quick Books Account.[14] The affidavits submitted in support of the search warrant applications discussed evidence from Gunter's laptop computer and thumb drive.

On March 13, 2008, Gunter was arrested and a federal grand jury subsequently returned a superseding indictment charging him with numerous counts related to the investment fraud schemes.

D.    *Gunter's Motion to Suppress*

---

[13] The jury was not present when SA Magos stated he began reviewing the thumb drive in late 2007.

[14] Quick Books is a dual entry accounting system that allows business owners to keep track of their business finances, such as cash inflows and outflows.

On August 3, 2010, Gunter moved to suppress all items seized from him by British authorities in April 2007, and thereafter searched by U.S. law enforcement agents without a warrant. Gunter argued the Fourth Amendment required the U.S. agents to obtain a warrant before searching his electronic data files, even if the files were lawfully seized in the United Kingdom and provided to U.S. officials by British authorities. Gunter also requested an evidentiary hearing to determine whether all the evidence seized pursuant to the March 2008 search warrants should be excluded as fruit of the poisonous tree.

The district court denied Gunter's motion without requiring a response from the Government and without holding an evidentiary hearing. The district court concluded even if Gunter's factual allegations were true, suppression of the evidence was not warranted. The district court reasoned that the Fourth Amendment does not apply to searches and seizures made by foreign authorities enforcing foreign law in their own country.

Gunter proceeded to trial and a jury convicted him on the following counts: one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349; one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956; thirteen counts of engaging in illegal monetary transactions, in violation of 18 U.S.C. § 1957; ten counts of mail fraud, in violation of 18 U.S.C.

§ 1341; and nine counts of wire fraud, in violation of 18 U.S.C. § 1343.  Gunter was sentenced to a total of 300 months' imprisonment.

## II.  STANDARD OF REVIEW

In considering the district court's ruling on a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Newsome*, 475 F.3d 1221, 1223 (11th Cir. 2007).  In conducting our review, we may consider any facts in the record, not just those presented at the suppression hearing.  *See id.* at 1224.  All facts are construed in the light most favorable to the prevailing party below—here, the Government.  *See id.* at 1223-24.

## III.  DISCUSSION

Gunter argues he had a reasonable expectation of privacy in the electronic data files seized from him by British authorities in the United Kingdom and thereafter provided to the United States.  Accordingly, U.S. officials allegedly violated the Fourth Amendment when they examined his files without a warrant.

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. Const. amend. IV.  "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."  *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656 (1984).  "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in

21

that property." *Id.* Searches and seizures implicate two distinct interests: a privacy interest affected by a search, and a possessory interest affected by a seizure. *See id.* We therefore must analyze the search and the seizure separately, keeping in mind that the fact that police have lawfully come into possession of an item does not necessarily mean they are entitled to search that item without a warrant. *See Walter v. United States*, 447 U.S. 649, 654, 100 S. Ct. 2395, 2400 (1980) ("The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents.").

Gunter does not challenge the seizure of his belongings by British authorities, as the Fourth Amendment exclusionary rule does not apply to searches and seizures conducted by foreign officials on foreign soil. *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976) ("The reasoning usually tendered in support of this limitation [on the exclusionary rule] is the doubtful deterrent effect on foreign police practices that will follow from a punitive exclusion of the evidence in question by an American court.");[15] *see also United States v. Janis*, 428 U.S. 433, 455 n.31, 96 S. Ct. 3021, 3033 n.31 (1976) ("[T]he exclusionary rule, as a deterrent sanction, is not applicable where a private party or a foreign government commits the offending act."). The Fourth Amendment exclusionary

---

[15] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

rule does, however, apply to searches and seizures conducted by U.S. state and federal officials. *See generally Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684 (1961). Consequently, Gunter contests only the search of his data files conducted in the United States by U.S. officials.

To prove the search of his data files was unconstitutional, Gunter must show he had an objectively reasonable expectation of privacy in the data files when United States agents examined them. *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006). An objectively reasonable expectation of privacy is one that society is prepared to recognize as reasonable. *Id.* An individual does not have a reasonable expectation of privacy in an object to the extent the object has been searched by a private party. *See Jacobsen*, 466 U.S. at 119-20, 104 S. Ct. at 1659-60. In *Jacobsen*, the Supreme Court considered a case in which Fedex employees inspected a damaged package and discovered a tube containing a series of plastic bags, the innermost of which was filled with white powder. *Id.* at 111, 104 S. Ct. at 1655. The employees called the Drug Enforcement Agency. *Id.* When the first DEA agent arrived, he removed the tube from the box and took the plastic bags out of the tube. *Id.* The Supreme Court held the agent's warrantless search was constitutional to the extent it simply replicated the prior private search. *Id.* at 113-21, 104 S. Ct. at 1656-60. The Court reasoned the officer's acts "enabled [him] to learn nothing that had not previously been learned during the

23

private search," and "[t]he agent's viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment." *Id.* at 119-20, 104 S. Ct. at 1660.

Although the third party who conducted the prior search in *Jacobsen* was a private actor, the reasoning in *Jacobsen* applies with equal force when the third party who conducts the prior search is a foreign governmental official. The Fourth Amendment generally does not apply to the actions of foreign officials enforcing foreign law in a foreign country just as it does not apply to the actions of private parties. And, in both cases, an entity other than a U.S. state or federal agent or official has already examined the object and its contents and therefore eliminated the individual's reasonable expectation of privacy in the contents. *See id.* at 117, 104 S. Ct. at 1658 ("Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information."). As a result, agents of the Government do not violate the Fourth Amendment when they replicate a prior search without a warrant.

To the extent British officials searched Gunter's data files before sending them to Agents Cerreta and Magos, Gunter had no reasonable expectation of privacy in the files when the U.S. agents examined them. Without a reasonable

24

expectation of privacy in the data files, Gunter cannot claim the protection of the Fourth Amendment.[16]

According to Gunter, however, there is no evidence in the record that the British authorities searched his data files (i.e., actually opened and looked at them) after seizing them.[17]  We disagree.  After a thorough review of the record, we are convinced British authorities searched Gunter's electronic data files before sending them to the United States.  We reach this conclusion based on the intensity of the SFO's investigation, its pattern of inspecting all seized evidence, Investigator Littler's witness statement, and the totality of the record.  *See United States v. Epps*, 613 F.3d 1093, 1097 (11th Cir. 2010) ("When reviewing the denial of a motion to suppress, this Court is not restricted to the evidence presented at the suppression hearing and instead considers the whole record.").

The SFO, the agency in charge of the investigation, expended great effort to gather evidence of the fraud scheme in which Gunter participated.  The SFO undertook fifteen searches on the same day in different locations throughout the UK; sought and obtained international assistance; traveled to Spain twice to

[16] The Government urges us to adopt a per se rule that an individual loses his reasonable expectation of privacy in any belongings *seized* abroad by foreign authorities as part of a foreign criminal investigation, even if foreign authorities have not *searched* the individual's belongings. We do not address or decide that issue because we conclude foreign authorities searched Gunter's belongings.

[17] Again, Gunter does not contest the constitutionality of the seizure of his files by British authorities in the United Kingdom.  He contests only the subsequent search conducted by U.S. officials in the United States.

investigate; and participated in searches carried out in Spain.   Throughout the course of its investigation, the SFO repeatedly searched any evidence it discovered or received.  The SFO inspected the contents of each of the seven boxes it received from the Spanish police in March 2006.  SFO investigators also analyzed the approximately fifty computers and numerous boxes of documents seized in Spain in November 2006.

In addition, British officials seized six items in total from Gunter, including two cell phones, but only provided the United States and the City of London Police with image copies of two of the items:  Gunter's laptop and his thumb drive.  This suggests the British officials reviewed all of the seized items and then determined the other electronic devices—the cell phones, the CDs, and the camera—did not relate to the fraud, while the laptop and thumb drive did.

The record also leads to the conclusion that Investigator Littler not only copied, but examined, the thumb drive and laptop computer.  Investigator Littler's signed witness statement says he discovered an error on the date and time of the laptop computer settings "[d]uring analysis."  Moreover, trial testimony established that the routine procedure in the UK for handling electronic evidence, like the thumb drive, is for a forensic analyst at the SFO, such as Investigator Littler, to both "examine the [electronic material] and copy it."  Nothing in the record suggests Investigator Littler deviated from this protocol.

26

In short, given the intensity of the SFO's investigation, its pattern of inspecting all seized evidence, Investigator Littler's witness statement, and the totality of the record, we are convinced British officials reviewed Gunter's data files before sending them to the United States.  As a result, Gunter had no reasonable expectation of privacy in the files when the U.S. officials examined them.  Under the circumstances of this case, the district court did not err by denying Gunter's motion to suppress.

## *CONCLUSION*

For the foregoing reasons, Odoni's and Gunter's convictions and sentences are **AFFIRMED**.