[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-13325
_____

D.C. Docket No. 1:14-cr-20160-DPG-5

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LAZARO ENRIQUE MENDEZ,
STAVROULA PHILIPPOU MENDEZ,
a.k.a. Stella,
a.k.a. Estella,
MARIE ELEANOR MENDEZ,
a.k.a. Marie Toro,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 11, 2018)

Before WILLIAM PRYOR and JILL PRYOR, Circuit Judges, and RESTANI,[*] Judge.

PER CURIAM:

Five members of the Mendez family, along with several of their associates, were charged in connection with a far-reaching mortgage fraud scheme, begun in 2006 and spanning four housing developments: Parc Central Aventura, Diane Condominiums, Yolanda Villas, and Blue Waves. The persons charged with this scheme included patriarch Luis Mendez ("Luis"), his wife Stavroula Mendez ("Stavroula"), their sons Lazaro Mendez ("Lazaro") and Luis Michael Mendez ("Michael"), and Michael's wife Marie Mendez ("Marie").[1] This appeal concerns only Lazaro, Stavroula, and Marie (collectively, "Appellants"), who were convicted of bank fraud, wire fraud, and conspiracy to commit bank and wire fraud.

Luis was a real estate developer who ran Barmeco Enterprises, Inc. ("Barmeco"), where Appellants were employed in various capacities. Stavroula worked primarily as an administrator at Barmeco's Miami Beach office. Marie performed various administrative functions, including a supervisory role at Yolanda Villas, a Barmeco-owned apartment complex. Lazaro worked with his

---

[*] Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

[1] Michael pleaded guilty to conspiring to commit bank and wire fraud and had the other charges against him dismissed. Luis was a fugitive at the time of trial and remains a fugitive.

2

father in sales.  The Mendez's scheme involved paying mortgage brokers to recruit straw buyers to submit often-falsified mortgage loan applications, for the purchase of units in complexes owned or controlled by Mendez family members.  All loan applications relevant to this appeal were presented to the banks through mortgage brokers.

Tania and Leidy Masvidal of EZY Mortgage ("EZY") were the first brokers to participate in the scheme, which began at Parc Central.  Later, working with the Masvidals as well as other brokers who facilitated similar falsifications, the Mendez family expanded this scheme to Yolanda Villas, Diane Condominiums, and Blue Waves.  Relevant to this appeal, these other brokers included:  (1) Wilkie Perez, and his companies Kinetic Mortgage, L&P Management and Consulting, and VGP Management and Consultants; and (2) Jorge Assef, a broker, who worked with Alfredo Chacon, a recruiter of straw purchasers, and Chacon's company, TCB Property Management.

Once a loan was secured, it was used to pay the unit purchase price, roughly $220,000 per unit.  When, for example, the Masvidals had recruited a straw purchaser for a Yolanda Villas unit, Barmeco first used those loan proceeds to pay down Barmeco's mortgage on the Yolanda Villas building by $152,500.  Barmeco, through Stavroula, then distributed the remaining money to one of two companies created by the Masvidals.  From this sum, the Masvidals each took $7,000, as did

3

Lazaro, and straw purchasers were paid $2,000.  The Masvidals used the remaining money to satisfy monthly loan payments and cover other straw purchasers' "cash to close," as necessary.  The units were thereafter rented to third parties.  Stavroula distributed monthly rental fees to the Masvidals' companies, in the form of checks signed by Marie.  These funds were applied to loan payments not covered by the loan proceeds.  This scheme continued until 2008, when the real estate market turned and most of the properties involved in this scheme entered foreclosure.

Following a joint trial before a jury, the district court denied Appellants' motions for judgments of acquittal, and all Appellants were convicted as charged. On appeal, Stavroula and Marie challenge the sufficiency of the evidence of knowledge for certain counts, all Appellants challenge the district court's preclusion of arguments relating to banks' lending practices, Lazaro and Marie challenge the jury instructions' reference to the "deliberate ignorance" theory of knowledge, all Appellants challenge the district court's loss calculations for sentencing purposes, and Marie challenges the sentencing judge's failure to make relevant conduct findings.  We have jurisdiction over this matter pursuant to 28 U.S.C. § 1291.  *See Butler v. Sukhoi Co.*, 579 F.3d 1307, 1311 (11th Cir. 2009). We reject all but the last challenge.

## A. Sufficiency of the Evidence

The government must prove defendant's knowledge to prove bank fraud under 18 U.S.C. § 1344 and intent to prove wire fraud under 18 U.S.C. § 1343.[2] *See United States v. De La Mata*, 266 F.3d 1275, 1298 (11th Cir. 2001) (bank fraud); *United States v. Brown*, 40 F.3d 1218, 1221 (11th Cir. 1994) (wire fraud). Stavroula and Marie challenge the sufficiency of the evidence of their knowledge. To prevail against a motion for judgment of acquittal, the government, having the benefit of all reasonable inferences in its favor, must present evidence such that "'a reasonable jury could have found that the evidence established the appellants' guilt beyond a reasonable doubt . . . .'" *United States v. Starrett*, 55 F.3d 1525, 1541 (11th Cir. 1995) (alteration in original) (quoting *United States v. Russo*, 796 F.2d 1443, 1455 (11th Cir. 1986)). "As with other fraud crimes, 'circumstantial evidence may prove [a defendant's] knowledge.'" *United States v. Martin*, 803 F.3d 581, 588 (11th Cir. 2015) (alteration in original) (quoting *United States v. Williams*, 390 F.3d 1319, 1325 (11th Cir. 2004)) (discussing both bank and wire fraud).

Sufficient evidence indicates that Stavroula knowingly participated in the challenged bank and wire fraud Counts:  6, 7, and 16–19.  Each concerned

---

[2] The "knowingly" and "intentionally" *mens rea* standards at issue are substantively identical, and will collectively be referred to as the "knowledge element." *See United States v. Odoni*, 782 F.3d 1226, 1232 (11th Cir. 2015) (*mens rea* standard for mail and wire fraud is "knowingly and intentionally").

submission of fraudulent loan documents in the names of third persons to obtain mortgages to purchase property at Yolanda Villas. For every transaction, the government produced evidence that Stavroula wrote one check from Barmeco after each loan had closed.

As to Counts 7 and 17, which involved checks to the Masvidals, the record also indicates that Stavroula supplied the Masvidals with lists of Yolanda Villas units for which straw buyers should be sought, and expressed a concern to Tania Masvidal that EZY's president and Lazaro were listed as officers of the Masvidals' first shell company, Hope Investments of Kendall. Such overlap could lead lenders to seek additional assurances if the seller, Barmeco, were seen to be paying a company owned by the mortgage broker, who is supposed to work for the buyer in arm's-length transactions. As a licensed mortgage broker, Stavroula almost certainly knew this. Shortly after this conversation, the Masvidals created Best Investments of Kendall, with Tania Masvidal as the only officer.[3] Stavroula's mortgage broker credentials and significant financial responsibility within Barmeco indicate an extensive awareness and understanding of Barmeco's activities. *Cf. United States v. Elashyi*, 554 F.3d 480, 497 (5th Cir. 2008) (affirming a knowledge finding based on the "deep familial relationship," defendant's role in the fraudulent transaction, and the small, family-run nature of

---

[3] Although Leidy Masvidal was a director of EZY, Tania Masvidal was not.

6

the business).  Her interactions with the Masvidals, most convincingly her provision of target units, support the jury's conclusion that Stavroula knew the illicit purpose of her check-writing.

Counts 6 and 18 involved checks to Wilkie Perez, and Counts 16 and 19 involved checks to ML17, a company owned and directed by Marie and Michael. The checks were forwarded to Alfredo Chacon.  Stavroula's family and business relationships with other major players in the Mendez's fraud scheme again indicates an awareness of that scheme.  A family relationship alone, however, is not sufficient to prove knowledge.  *See United States v. Villegas*, 911 F.2d 623, 630 (11th Cir. 1990).  When combined with other indicia, however, it can be probative of a defendant's knowledge of the substantive offense.  *See United States v. Ritz*, 548 F.2d 510, 522 (5th Cir. 1977) ("The fact of the close association of the several parties and their association with Robert, Sr. the father who was the source of four of the bills is one circumstance from which the jury might infer knowledge.").

On this record, additional indicia exist.  First, the transfers at issue in these counts were structured essentially the same as were the earlier transactions in Counts 7 and 17, just with different recipients.  Second, where Barmeco stood to benefit from a fraudulent transaction, so too did Stavroula.  Third, her interactions with the Masvidals and other Mendez family members who were induced to form

7

shell corporations and open bank accounts indicate Stavroula's business acumen, and make it unlikely she was simply an unwitting dupe.[4]  Fourth, Stavroula's checks referenced the unit numbers of the apartments sold.  Combined, these circumstances constitute sufficient evidence that Stavroula knew her check-writing served to distribute proceeds of the fraud.  *See Martin*, 803 F.3d at 588.

Furthermore, sufficient evidence demonstrates Marie knowingly participated in the bank and wire fraud Counts which she challenges:  5, 8, 16, and 19.  Count 5 charged Marie with the 2006 submission of a false application used to obtain a mortgage loan to purchase Blue Waves Unit 206.  The record contains several false documents signed by Marie, relevant to Count 5.  For Blue Waves Unit 206, Marie signed an affidavit indicating she would use that unit as her primary residence.  Within a month prior to the Unit 206 transaction, Marie had signed two other such affidavits in applying for mortgages to purchase Blue Waves Units 214 and 218.[5]  There is no suggestion Marie used any of these units as her primary residence.  For the Unit 206 transaction, furthermore, record evidence indicates Stavroula

---

[4] In particular, in 2008, Stavroula persuaded her then-24-year-old nephew, who had done secretarial work at Barmeco's office, to form a new company, ESJ Group, and open a corresponding bank account.  Stavroula and Luis transferred money from their other companies into ESJ's account.  Stavroula was authorized to transfer money from ESJ's account in October 2009, whereupon she immediately moved that money to accounts in Switzerland and Lichtenstein.

[5] The government presented samples of Marie's signature for comparison.  The jury is competent to compare signatures and draw its own conclusions.  *United States v. Cavallo*, 790 F.3d 1202, 1230 (11th Cir. 2015) (citing *United States v. Bell*, 833 F.2d 272, 276 (11th Cir. 1987)).

communicated her desire to front Marie's "cash to close" to the loan brokers, the Masvidals, Stavroula wired that money to Marie, and Marie signed a HUD-1 Form which indicated that she was paying roughly $26,000 "cash to close."

Marie concedes that she signed the loan application, but argues that the loan application was doctored between her signing it and the Masvidals' submitting it. A jury should not presume a defendant's knowledge of documents he or she signed, but juries are permitted to infer such knowledge. *See United States v. Gaines*, 690 F.2d 849, 853–54 (11th Cir. 1982). From the record evidence it is reasonable to conclude that Marie knew her Unit 206 application contained falsifications when submitted to the lender.

The Unit 206 transaction occurred roughly eight months after the Masvidals began assisting in the overall mortgage fraud scheme. Marie worked on the rental and property management side of the business, not in loan procurement, but in this capacity she made out checks remitting rent payments to the same company which also received the Masvidals' post-closing payments, and communicated with Tania Masvidal about these rent payments. The Masvidals' partnership with the Mendez family was very lucrative, and Marie's contact with the Masvidals, coupled with her receipt of "cash to close" from Stavroula, and repeated submission of falsified documents in similar transactions, constitutes sufficient evidence supporting the jury's verdict.

9

Counts 8, 16, and 19 involved submission of fraudulent documents to obtain loans to purchase property at Diane Condominium (Count 8) and Yolanda Villas (Counts 16 and 19).  For Diane Condominiums, sales proceeds went directly to LM Rentals, which was owned by Marie and Michael.  LM Rentals then wired the money to ML17, which listed Marie as its "director-treasurer."  Finally, Marie split the money into two checks from ML17 to a company owned by Alfredo Chacon, TCB Property Management.  The procedure following sales at Yolanda Villas was similar:  sales proceeds went to Barmeco, whereupon Stavroula sent a check to ML17, at which point Marie wrote two checks to TCB Property Management.

Although other nominal officers of Mendez-affiliated companies were inactive after helping to form those companies, Marie's situation was markedly different.  She was an active treasurer who wrote checks for hundreds of thousands of dollars from ML17 accounts.  Between September 2007 and June 2008, the two largest of these checks went to Chacon's company, one being for the Count 16 sale.

The check-writing from ML17 to TCB Property Management, in isolation, is perhaps not "so obvious that knowledge of its character can fairly be attributed to [the defendant]." *United States v. Moran*, 778 F.3d 942, 960–61 (11th Cir. 2015) (quoting *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013)), *cert. denied*, 136 S. Ct. 268 (2015).  Nevertheless, for Count 8 in particular, the money

10

took a curiously circuitous route.  LM Rentals, owned by Marie and Michael, received the proceeds of the Diane Condominiums sale, which it wired to ML17, also owned by Marie and Michael.  Marie then cut multiple checks to Chacon's company in short succession.  Likewise, for Counts 16 and 19, the association of the monies with specific unit numbers and Marie's splitting of checks to Chacon gives more than a little pause.  With Marie writing large checks, relative to ML17's usual expenditures, a jury could infer that, as treasurer, she was aware of the purpose of those checks.[6]  The other party who might supply such explanations was ML17's other principal, Michael, to whom Marie was married.[7]

These facts, combined with Marie's extensive interaction with the Masvidals, who played a role similar to that of Chacon, and the repetitive nature of her dealings with Chacon, supply sufficient evidence for a jury to conclude, beyond a reasonable doubt, that Marie understood the purpose of the transactions at issue in Counts 8, 16, and 19.

The foregoing likewise constitutes sufficient evidence for a jury to conclude beyond a reasonable doubt that Marie knowingly participated in the overall conspiracy, charged in Count 1.  "To sustain [a] conspiracy conviction under 18 U.S.C. § 1349, the government must prove that (1) a conspiracy existed; (2) the

---

[6] *See United States v. Hill*, 643 F.3d 807, 863 (11th Cir. 2011) ("A jury is not required to put aside its common sense or to assume that defendants have none.").

[7] There was no evidence that ML17 employed anyone else at the time of these transactions.

defendant knew of it; and (3) the defendant knowingly and voluntarily joined it." *Moran*, 778 F.3d at 960.  The knowledge required is only knowledge of "'the essential nature of the conspiracy.'"  *Id.* (quoting *Vernon*, 723 F.3d at 1273). "Guilt may exist even when the defendant plays only a minor role and does not know all the details of the conspiracy." *United States v. Perez-Tosta*, 36 F.3d 1552, 1557 (11th Cir. 1994).  The fraudulent transactions in which Marie participated were consistent with the overall scheme in all material respects and furthered its purpose.  *See Martin*, 803 F.3d at 588–89; *Hill*, 643 F.3d at 864–65.

## B. Preclusion of Evidence and Arguments Regarding Banks' Lending Practices

On relevance grounds, the trial judge sustained the government's objections to arguments and questioning regarding banks' intentionally risky lending practices, reasoning that these practices were only probative of the bank's negligence, which is not a defense to fraud.  Appellants now argue that precluding this line of questioning violated their rights under the Sixth Amendment of the Constitution.  U.S. Const. amend. VI.  "While the district court has 'discretionary authority to rule on the admissibility of evidence, including the power to limit cross-examination,' this discretion is limited by the guarantee of the Sixth Amendment's Confrontation Clause . . . ."  *United States v. Maxwell*, 579 F.3d

12

1282, 1296 (11th Cir. 2009) (quoting *United States v. Garcia*, 13 F.3d 1464, 1468 (11th Cir. 1994)).

The Sixth Amendment guarantees defendants' "right to have a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006) (internal quotation marks omitted). Appellants contend that evidence of banks' lending practices was relevant to the jury's assessment of: (1) the materiality of Appellants' false statements; and (2) Appellants' fraudulent intent.

Regarding materiality, Appellants argue that the misrepresentations contained in the various loan applications were immaterial, as they were incapable of influencing the banks. *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc),[8] establishes two alternative modes of proof: an objective standard, which formed the basis of Appellants' conviction, and a subjective standard.[9] The district court's jury instruction, which indicated that materiality could be satisfied where defendant "should have known that *a* mortgage lender would likely regard the statement as important," is consistent with *Svete's* standard. Regardless of whether these particular mortgage lenders acted with

---

[8] *Svete* interprets the federal mail fraud statute, 556 F.3d at 1161–62, but the bank and wire fraud statutes at issue in this case cover a similarly broad scope of fraud.

[9] In contrast to this matter, the subjective rather than objective standard occupied much of the court's discussion in *Svete*. 556 F.3d at 1165–70.

intentional disregard for suspected falsity, the falsehoods contained in the mortgage applications could have been relied upon by an objectively reasonable mortgage lender. Additional evidence of these particular mortgage lenders' unreasonable lending practices would not be relevant to an objective assessment of materiality.

As for fraudulent intent, *Svete* clearly holds that victim negligence does not vitiate a fraudster's criminal intent. 556 F.3d at 1165.[10] *Svete* does not directly address the relevance of a victim's intentional malfeasance, though it does note that "'[t]he focus of the language defining a scheme to defraud is on the violator, not the victim.'" *Id.* (quoting *United States v. Drake*, 932 F.2d 861, 864 (10th Cir. 1991)).

Appellants' arguments regarding the intent element fail because a victim's actions upon encountering defendants' fraudulent scheme do not vitiate the defendant's prior intent in pursuing the fraudulent transaction. Even if the victim later embraced the scheme despite being aware of the fraud, that would not extinguish the scheme itself, or the defendant's initial intent to deceive. As *Svete*

---

[10]    Because the focus of the mail fraud statute, like any criminal statute, is on the violator, the purpose of the element of materiality is to ensure that a defendant actually intended to create a scheme to defraud. Proof that a defendant created a scheme to deceive reasonable people is sufficient evidence that the defendant intended to deceive, but a defendant who intends to deceive the ignorant or gullible by preying on their infirmities is no less guilty. Either way, the defendant has criminal intent.

*Svete*, 556 F.3d at 1165.

14

notes, one can be convicted of mail or wire fraud "'even if his targeted victim never encountered the deception—or, if he encountered it, was not deceived.'" *Id.* at 1166 (quoting *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991), *abrogation on other grounds recognized by Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017)). Appellants have made no allegation that the banks were part of the Mendezes' scheme from its inception. Thus, no constitutional violation occurred because Appellants were precluded from advancing only an irrelevant defense. Appellants do not argue, and the court does not conclude, that the district court otherwise abused its discretion.

## C. Deliberate Ignorance Instruction

Over defendants' objections, the court issued a deliberate ignorance instruction. Appellants argue that this instruction was inappropriate because record evidence points only to actual knowledge. A deliberate ignorance instruction is proper where "the facts . . . support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Rivera*, 944 F.2d 1563, 1571 (11th Cir. 1991) (alteration in original) (quoting *United States v. Alvarado*, 838 F.2d 311, 314 (9th Cir. 1987)). "A district court should not instruct a jury regarding deliberate ignorance when the evidence only points to either actual knowledge or no

15

knowledge on the part of the defendant." *See United States v. Schlei*, 122 F.3d 944, 973 (11th Cir. 1997) (citation and internal quotation marks omitted).

Nevertheless, "instructing the jury on deliberate ignorance is harmless error where the jury was also instructed and could have convicted on an alternative, sufficiently supported theory of actual knowledge." *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008); *see also Hill*, 643 F.3d at 855. Appellants argue this situation is unique, as the government's closing argument urged Lazaro's guilt because he "should have known" he was participating in a fraudulent deal. Yet, Appellants failed to object to the impugned statement, and the district court "emphasize[d] that negligence, [carelessness] or [foolishness] isn't enough to prove that a defendant knew about the bank fraud or wire fraud," in its instructions to the jury.

Assuming, *arguendo*, there was insufficient evidence to support a deliberate ignorance finding, and that such instruction was therefore improper, this situation does not warrant deviation from our approach in *Steed*. As we explained above, the evidence was sufficient for the jury to infer Stavroula's and Marie's actual knowledge of the fraudulent scheme. There was also sufficient evidence as to Lazaro's actual knowledge to render the deliberate ignorance instruction harmless error. For example, the Masvidals testified they had conversations with Lazaro about providing false employment information for borrowers, and that Lazaro

16

provided that information.  Furthermore, Tania Masvidal testified that Lazaro encouraged her to create a corporation to accept and distribute mortgage proceeds. Because the district court's instructions cured any defect created by counsel's statement, and jurors are presumed to follow the court's instructions, *see, e.g.*, *Jamerson v. Sec'y for Dep't of Corr.*, 410 F.3d 682, 690 (11th Cir. 2005), we discern no reversible error in giving the deliberate ignorance instruction.

**D. Sentencing Challenges**

Appellants raise three specific challenges to the district court's calculation of overall loss for sentencing purposes:[11]  (1) for loans not subject to a foreclosure judgment, the calculations failed to use lender records to incorporate payments against the principal; (2) for Federal Housing Administration insured loans, the calculations included interest; and (3) the outstanding principal balance is not an accurate measure of loss to successor lenders, which held an indeterminate number of Appellants' mortgages at the time of sentencing.

The Sentencing Guidelines do not require a precise determination, but rather a reasonable estimate of the loss, based on available evidence that is "reliable and specific."  *United States v. Barrington*, 648 F.3d 1178, 1197–98 (11th Cir. 2011) (citation and internal quotation marks omitted); U.S.S.G. § 2B1.1, cmt. n. 3(C).

---

[11] Under the Sentencing Guidelines in force at the time of Appellants' July 8, 2015, sentencing hearing, a 22-point enhancement applied to losses over $20 million and under $50 million. U.S.S.G. § 2B1.1(b)(1)(L) (U.S. Sentencing Comm'n 2014).  The district court found that Appellants' caused a loss of $27,882,027.68.

Appellants' first argument applied to roughly ten percent of the loans involved, and the agent of the Federal Housing Finance Agency who performed these calculations testified that principal payments did not significantly alter the loss amount for the other ninety percent of loans.[12]   The district court accordingly found that these principal payments could not reduce the total loss below the $20 million Sentencing Guidelines threshold, and used available information to estimate the loss amount.  This is reasonable, and we are not "'left with a definite and firm conviction that a mistake has been committed.'"  *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) (quoting *United States v. Clarke*, 562 F.3d 1158, 1165 (11th Cir. 2009)).

Assuming *arguendo* that Appellants properly raised their interest-related claims,[13] although the Sentencing Guidelines do provide that interest shall not be factored into a loss amount calculation, U.S.S.G. § 2B1.1, Advisory Note 3(D)(i), this error affected only six out of the 181 loans at issue.  As the district court found, even if combined with the excluded principal payments referenced above, this amount would not reduce loss calculations enough to impact Appellants' Sentencing Guidelines offense level.  "A sentencing error, under the Guidelines, is

---

[12] The total amount of the loans was roughly $35.2 million.  Credits associated with the ninety percent of loans which had entered foreclosure reduced the total by $6.5 million, to $27.8 million.  This reduction accounted for both money received as principal payments *and* the value of the property.

[13] Appellants specifically declined to raise this challenge at trial because the affidavit by the U.S. Probation Officer who calculated the loss amount did not mention any FHA loans.

18

harmless if a court considers the proceedings in their entirety and determines that the error did not affect the sentence or had but very slight effect." *United States v. Campa*, 529 F.3d 980, 1013 (11th Cir. 2008) (citation and internal quotation marks omitted). The record indicates that the district court was aware of the foregoing two issues, and does not suggest that those marginal differences played a role in determining Appellants' sentences.

Appellants' final loss calculation argument – that they were entitled to a loss amount deduction for loans that were sold to successor lenders – was not raised in the district court, and thus we review it for plain error. *See United States v. Anaya Castro*, 455 F.3d 1249, 1253 (11th Cir. 2006). "The plain-error test has four prongs: there must be (1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are met, then a court may exercise its discretion to correct the error if (4) the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Madden*, 733 F.3d 1314, 1320 (11th Cir. 2013) (quoting *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993)) (alteration in original). "[A]t least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003). Appellants cited *Martin* for support, but that opinion

19

addressed how to apportion restitution among specific victims, not how to calculate overall loss. *See* 803 F.3d at 594–96. There, we affirmed the defendant's sentence, despite remanding for a redetermination of restitution awards. *Id.* at 596. Having found no binding precedent requiring that loss calculations account for the sale of a mortgage to a successor lender, we find no plain error.

Finally, Marie argues that the district court failed to make an individualized finding about the scope of relevant conduct attributable to her, as is required by the Sentencing Guidelines. Marie raised this argument before and during the sentencing hearing. The Sentencing Guidelines require that the sentencing level for a defendant convicted of participating in a conspiracy be based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003) (emphasis omitted) (language unchanged in U.S.S.G. § 1B1.3(a)(1)(B)). Under Section 1B1.3, "a sentencing court should make explicit relevant-conduct findings in order to facilitate appellate review . . . Importantly, however, a district court's failure to make such explicit findings . . . does not warrant reversal— 'where the court's decisions are based on clearly identifiable evidence.'" *United States v. Siegelman*, 786 F.3d 1322, 1331 (11th Cir. 2015) (quoting *United States v. Bradley*, 644 F.3d 1213, 1293 (11th Cir. 2011)). Here, while the district court made general statements as to Marie's role in the scheme, it did not clearly make

relevant conduct findings.[14]  This failure to make explicit findings is error under

*Siegelman*.  Accordingly, we vacate Marie's sentence and remand for the district

court to make the necessary findings as to the relevant conduct applicable to Marie.

In all other challenged respects, we affirm the judgment of the district court.

**AFFIRMED in part, VACATED and REMANDED in part**.

---

[14] At oral argument, the government highlighted a passage in which the district court overruled an objection to a finding that Marie used sophisticated means.  In its brief, the government cited the downward variance portion of the sentencing hearing.  Neither section contained relevant conduct findings.